# Kanter v. Epstein

354

*George Bochetto,* for plaintiff.
*Daniel J. Dugan* and *Alan B. Epstein,* for defendants.

PAPALINI, *J.,* February 26, 2004—The plaintiff and both defendants have filed appeals with respect to this case. This opinion will address the contentions raised in all the pending appeals. The history of this case, especially after verdict, is complex.

## I. FACTUAL HISTORY

(1) On January 25, 2001, plaintiff, Nancy Kanter, Esquire, filed suit against the defendants, Alan B. Epstein, Esquire, and the firm with which he is associated, Spector Gadon & Rosen P.C. (SGR), claiming that she was deprived of a referral fee of $431,000. The complaint included counts of anticipatory breach of contract and conversion and demanded both compensatory and punitive damages.

(2) The matter was tried by a jury with the undersigned presiding. Plaintiff was represented by George Bochetto, Esquire, and the defendants were represented by Daniel J. Dugan, Esquire, and Alan B. Epstein, Esquire. On May 8, 2002, the jury returned with a verdict in favor of plaintiff against both defendants in the amount of $215,000, compensatory damages. In answer to interrogatories, the jury found that defendants had both breached a contract with plaintiff and that they had committed a conversion of the funds due plaintiff.

(3) On the basis of the jury finding that a conversion had occurred, we directed defendants to supply plaintiff with financial information so plaintiff could proceed with the punitive damages phase of the trial. Defendants failed to comply. On May 13, 2002, the jury did not award punitive damages.

(4) On May 14, 2002, plaintiff filed a motion for section 2503 sanctions (motion no. 050803). On May 17, 2002, plaintiff filed post-trial motions. On May 23, 2002, defendants filed a motion for post-trial relief and a request for a court en banc. For purposes of Pa.R.C.P. 227.4(b), the date by which we had to decide the motions was September 16, 2002. A briefing schedule was set, with oral argument originally scheduled for August 22, 2002.

(5) Because of a delay in the transcription of the notes of testimony, defendant SGR requested an extension of the briefing dates and oral argument. Between June 19, and June 24, 2002, all *parties agreed* in writing to the extension request and *a concomitant extension of Rule 227.4.*

(6) On September 17, 2002, we issued a rule to show cause on defendants why they should not be held in civil contempt for failure to prepare and produce at the punitive damages stage of the trial, financial records as directed by the court, citing N.T. 753-57, 5/1/02; N.T. 1448-52, 5/6/02; N.T. 1498-1500, 5/8/02; N.T. 3-7, 16-31, 5/9/02); and why defendants should not be liable for reasonable counsel fees pursuant to 42 Pa.C.S. §2503.

(7) The rule was returnable November 25, 2002. Briefs were due and received from all parties prior to that date.

(8) Oral argument was held on November 25, 2002. Plaintiff was represented by Mr. Bochetto. Both defendants were represented by Mr. Dugan. In addition to substantive legal arguments, there were also discussions both off and then on the record regarding the procedure to be followed in resolving the issues presented to the court. The court agreed with plaintiff that discovery regarding defendants' finances was necessary. *It was agreed on the record that:*

*(a) Rule 227.4 was extended to March 14, 2003.*

(b) By December 9, 2002, both plaintiff and defendants would submit lists of documents they want in discovery. All challenges to the lists had to be submitted by December 26, 2002.

(c) Between November 25, 2002 and December 26, 2002, both sides could file additional briefs, and Mr. Bochetto was required to submit a list of specific counsel fees that he was demanding.

(d) After December 26, 2002, the court would issue an order regarding the scope of discovery, including both documents and depositions.

(e) All discovery was to be completed by January 31, 2003.

(f) By February 18, 2003, both sides would submit discovery and additional memoranda.

(g) If deemed necessary by the court, a hearing on both sanctions and contempt would be scheduled for a date after February 18, 2003, but before March 14, 2003.

(9) Thereafter, both sides submitted their discovery lists, challenges to same and briefs.

358

(10) On December 30, 2002, we issued an order, with the following provisions:[1]

(a) Defendant Epstein shall comply with the plaintiff's combined interrogatories and document requests, as per plaintiff's filing dated December 9, 2002;

(b) Defendant Spector Gadon & Rosen P.C. shall comply with the plaintiff's combined interrogatories and document requests, as per plaintiff's filing dated December 9, 2002;

(c) Defendant Epstein shall appear for deposition;

(d) Steven Gadon, Esquire, shall appear for deposition;

(e) Defendant Epstein shall supply to plaintiff the full name and service of process address for Mrs. Epstein (unless defendant Epstein consents to accept service of her subpoena);

(f) Mrs. Epstein shall thereafter honor the subpoena, as per plaintiff's filing dated December 9, 2002;

(g) Defendant Epstein shall supply to plaintiff the full name and service of process address of the accountant for Mr. and Mrs. Epstein;

(h) Plaintiff may then serve the Epstein accountant with the subpoena, as per plaintiff's filing dated December 9, 2002, and said accountant shall honor said subpoena;

(i) Defendant Spector Gadon & Rosen P.C. shall supply to plaintiff the full name and service of process address of its accountant;

(j) Plaintiff may then serve said Spector Gadon & Rosen P.C. accountant with the subpoena, as per plain-

---

1. The order was immediately served on all parties but was not docketed until January 9, 2003.

tiff's filing dated December 9, 2002, and said accountant shall honor said subpoena;

(k) All parties shall cooperate in the scheduling of discovery and depositions so that all discovery and depositions are completed by January 31, 2003, as per the schedule established by the court and all parties on November 25, 2002.

(11) On January 8, 2003, defendants filed with the prothonotary of the court of common pleas a praecipe to enter judgment. On January 9, defendants filed notices of appeal (SGR: 186 EDA 2002; Epstein: 187 EDA 2003). *This was done despite the on-the-record agreement reached on November 25, 2002, to extend Rule 227.4 to March 14, 2003.*

(12) On January 10, 2003, the court issued an order intended to reassert and modify the order of December 30, 2002, with which defendants had failed to comply. The provisions were as follows:

(a) By 5 p.m., January 15, 2003, defendant Epstein shall provide Mrs. Epstein's full name and service address or written statement accepting full service of subpoena for her;

(b) By 5 p.m., January 15, 2003, defendant Epstein shall provide the name and service address of accountant(s) for the years 1997 to 2001;

(c) By 5 p.m., January 15, 2003, defendant SGR shall provide the name and service address of accountant(s) for the years 1997 to 2001;

(d) By 5 p.m., January 17, 2003, defendant Epstein and defendant SGR shall deliver all documents contained in plaintiff's combined interrogatories and document request of December 9, 2002;

(e) Mrs. Epstein shall be deposed at 9:30 a.m. on January 20, 2003, in plaintiff's counsel's office;

(f) The deposition of Epstein accountants shall be at 1 p.m. on January 20, 2003;

(g) Steven Gadon shall be deposed at 9:30 a.m. on January 21, 2003;

(h) SGR accountants shall be deposed at 1 p.m. on January 21, 2003;

(i) Defendant Epstein's deposition shall be at 9:30 a.m. on January 23, 2003.

(13) Defendants again failed to comply with the court's order of January 10, 2003. Therefore, on January 15, 2003, we issued the following order:

"Defendant Alan B. Epstein, Esquire, and defendant Spector Gadon & Rosen P.C. *shall* comply with this court's discovery order of January 10, 2003. Failure to comply will result in the imposition of a fine of $500 for each day of noncompliance by defendant Alan B. Epstein, Esquire, and a fine of $1,000 for each day of noncompliance by defendant Spector Gadon & Rosen P.C."

(14) On January 15, 2003, plaintiff filed a motion for contempt of contempt proceedings against defendants for the failure to comply with the court's order of January 10, 2003. (Motion no. 011174.)

(15) On January 16, 2003, defendant Epstein filed an appeal from our order of January 10, 2003 (301 EDA 2003), and our order of January 15, 2003 (302 EDA 2003). On January 16, 2003, defendant SGR filed an appeal from our order of January 10, 2003 (300 EDA 2003), and our order of January 15, 2003 (299 EDA 2003).

(16) On January 16, 2003, defendants filed with the Superior Court a "Petition for the issuance of a writ of prohibition restraining the Honorable Joseph I. Papalini from exceeding jurisdiction of his court and petition for expedited consideration." That petition was assigned to the Honorable Robert Graci.

(17) On January 22, 2003, we wrote to the prothonotary of the Superior Court, with a copy of the letter faxed to Judge Graci, requesting that the defendants' appeals be quashed as premature.

(18) On January 22, 2003, *Judge Graci issued an order denying defendants' petition for the issuance of a writ of prohibition.*

(19) On January 24, 2003, plaintiff filed with the Superior Court a motion to quash defendants' appeals.

(20) On January 29, 2003, plaintiff presented to this court a post-trial objection to security pursuant to Pa. R.A.P. 1737, but that was resolved as of March 7, 2003, when defendants posted alternate security.

(21) On February 13, 2003, Gabriel L.I. Bevilaqua, Esquire, and William Matthews, Esquire, entered their appearance on behalf of both defendants.

(22) On February 3, 2003, plaintiff filed a notice of appeal from the defendants' entry of judgment. (1161 EDA 2003.)

(23) On February 4, 2003, defendants filed a motion for clarification, reconsideration or, in the alternative, stay [of the court's orders of December 30, 2002, January 10, 2003 and January 15, 2003, pending the resolution of defendants' appeals]. (Motion no. 022428.)

(24) A conference was held on March 6, 2003.

(25) On March 7, 2003, we denied the defendants' motion for clarification, reconsideration or, in the alternative, stay. (Motion no. 022428.)

(26) On March 10, 2003, we issued the following order resolving all outstanding post-trial motions including motion no. 050803 and motion no. 011174:

"[A]fter consideration of plaintiff's post-trial motions, including a prayer that the defendants be held in civil contempt; plaintiff's motion for section 2503 sanctions; plaintiff's motion for contempt of contempt proceedings because of defendants' failure to comply with our order of January 10, 2003, and our order of January 15, 2003; defendants' motion for post-trial relief; and plaintiff's undocketed post-trial objection to security pursuant to Pa.R.A.P. 1737,

"It is hereby ordered and decreed that:

"(1) Defendants' motion for post-trial relief is denied;

"(2) Plaintiff's post-trial motions are denied in part and granted in part:

"(a) Plaintiff's request for an additur to the jury's award of compensatory damages is granted, and the award of compensatory damages is increased by $215,500 to $431,000;

"(b) Plaintiff's request for pre-judgment interest is granted; pre-judgment interest at the rate of 6 percent from March 3, 2001, totaling $30,429 is added to the award of $431,000, for a total award of $461,429;

"(c) Plaintiff's request for post-judgment interest is granted and shall be awarded from the date of judgment;

"(d) Plaintiff's request that defendants be judicially estopped from contesting the jury's award of compensatory damages is denied;

"(e) As to punitive damages, the court has concluded that plaintiff is entitled to relief; plaintiff may elect within 30 days to accept either of the following remedies:

"(i) A new trial on punitive damages only; or

"(ii) The sum of $645,000[2] payable by defendants to plaintiff in full satisfaction of plaintiff's claim for punitive damages;

"(3) Plaintiff's motion for section 2503 sanctions is granted: The court orders defendants to pay plaintiff the sum of $124,219.86 in attorney's fees pursuant to 42 Pa.C.S. §2503;

"(4) Plaintiff's additional requests for contempt citations against defendants are granted: defendants shall pay to the court of common pleas the sum of $7,500 as a penalty for their contemptuous conduct relating to the punitive damage phase of the trial;

"(5) The court finds that defendant Alan B. Epstein, Esquire, is in contempt of our order of January 15, 2003, and orders said defendant to pay plaintiff the accrued fines in the amount of $26,500;

"(6) The court finds that defendant Spector Gadon & Rosen P.C. is in contempt of our order of January 15, 2003, and orders said defendant to pay plaintiff the accrued fines in the amount of $53,000;

"(7) The order of this court dated January 15, 2003, continues in full force and effect, including the accruement of fines set forth therein until our discovery order is complied with;

---

2. We calculated punitive damages as approximately three times the compensatory damages awarded by the jury.

"(8) Plaintiff's undocketed post-trial objection to security pursuant to Pa.R.A.P. 1737 is dismissed as moot."

(27) On March 12, 2003, plaintiff filed a praecipe to enter judgment pursuant to the court's order of March 10, 2003, and elected to take the sum of $645,000 as punitive damages rather than have a new trial on punitive damages.

(28) On March 12, 2003, both defendants filed a notice of appeal of our order of March 10, 2003. (924 EDA 2003.)

(29) On March 13, 2003, defendants filed with this court an emergency motion for stay from court's March 10, 2003 order pending appeal. (Motion no. 031332.)

(30) A conference with counsel was held on March 17, 2003.

(31) On March 21, 2003, Richard A. Sprague, Esquire, entered his appearance on behalf of defendant SGR.

(32) On March 25, 2003, the Superior Court quashed defendants' appeals from our order of January 10, 2003. (300 EDA 2003 and 301 EDA 2003.)

(33) On March 26, 2003, the Superior Court quashed defendants' appeals from our order of January 15, 2003. (299 EDA 2003 and 302 EDA 2003.)

(34) On March 25, 2003, the Superior Court denied plaintiff's motion to quash defendants' original appeals [of our order of December 10, 2002, and judgment on the verdict entered January 8, 2003] "without prejudice to plaintiff's right to raise this issue at the time scheduled for submission or argument of this matter before a panel that will decide the merits of this appeal." (186 EDA 2003 and 187 EDA 2003.)

(35) On March 28, 2003, defendant SGR filed a motion to vacate court's orders of January 10, 2003, January 15, 2003 and March 10, 2003. (Motion no. 032798.) On March 28, 2003, defendant Epstein filed a motion to vacate and/or reconsider court's orders of January 10, 2003, January 15, 2003 and March 10, 2003. (Motion no. 032847.)

(36) On April 11, 2002, we issued an order disposing of motions no. 031332, no. 032798 and no. 032847:

"(1) Defendant Spector Gadon & Rosen P.C.'s motion to vacate this court's orders of January 10, 2003, January 15, 2003 and March 10, 2003 (no. 032798), is denied;

"(2) Defendant Alan B. Epstein, Esquire's motion to vacate this court's orders of January 10, 2003, January 15, 2003 and March 10, 2003 (no. 032847), is denied;

"(3) Both defendants' emergency motion for stay from court's March 10, 2003 order pending appeal (no. 031332), is granted in part:

"(a) The accrual of fines, referred to in paragraph 7 of our order of March 10, 2003, is suspended as of March 12, 2003;[1]

"(b) Pursuant to Pa.R.A.P. 1732(a) and 1733(a), the *total* security required to be filed by defendants to operate as a supersedeas, shall be in the amount of $1,106,-429.[2]

---

"1. This is the date plaintiff filed an election with respect to punitive damages, eliminating the need for further discovery.

"2. The security is required for the following damages:

| | |
|---|---|
| Jury verdict: | $ 215,500 |
| Additur: | 215,500 |
| Pre-judgment interest: | 30,429 |
| Punitive damages: | 645,000 |
| | $1,106,429" |

(37) On April 22, 2003, the Superior Court issued a stay pending disposition of appellants' emergency motions. (186, 187, 924 EDA 2003.)

(38) On May 5, 2003, appellants' emergency motion for a stay was denied. (186, 187, 924 EDA 2003.)

(39) On May 8, 2003, we ordered plaintiff and both defendants to file a statement of matters complained of on appeal, pursuant to Pa.R.A.P. 1925(b), by June 9, 2003. Those statements were filed.

(40) On May 28, 2003, the Pennsylvania Supreme Court ordered that the prior security filed by defendants on appeals 186 and 187 EDA 2003 in the amount of $258,000 shall act as a supersedeas as it relates to appeal 924 EDA 2003.

## II. ISSUES

A. *The Following Issue Was Raised by Plaintiff Kanter in Her 1925(b) Statement*

(1) Whether plaintiff should be granted additur of $216,000 on the jury's compensatory damages verdict where: (i) the jury heard: (A) this uncontested fact— plaintiff lawyer referred her minor client's personal injury case to defendant lawyer; (B) this contested fact— plaintiff so referred in exchange for promised receipt of a referral fee; (C) this uncontested fact—the referral fee

was valued at one-third of the attorney's fees that would be awarded in referred client's case; (D) these contested facts—after the referral fee agreement was struck, defendant lawyer merged his practice into defendant law firm and/or law firm otherwise assumed or co-assumed liability for paying referral fee; (E) this uncontested fact—the attorney's fees awarded in referred client's case amounted to $1,293,000 (net of costs); (ii) the jury returned a breach of contract and conversion verdict in favor of plaintiff and against defendants; (iii) the jury awarded plaintiff $215,000 thereon (that is, $216,000 less than one-third of $1,293,000).

Ms. Kanter preserved this matter for appellate review, including during trial on May 13, 2002. May 13, 2002 trial tr., 5-6, 14-17.

(2) Whether plaintiff/breach of contract verdict-winner should be awarded pre-judgment interest from the date defendants breached that contract and, if so, whether that interest should accrue upon the amount added to the compensatory damages verdict in the event additur is granted.

Ms. Kanter preserved this matter for appellate review, including pretrial, in her complaint. Complaint, 7 (Count I Wherefore clause); 9 (Count II Wherefore clause).

(3) Whether plaintiff/breach of contract and conversion verdict-winner should be awarded post-judgment interest from the date judgment thereon is entered and, if so, whether that interest should accrue upon the amount added to the compensatory damages verdict in the event additur is granted.

Ms. Kanter preserved this matter for appellate review, including pretrial, in her complaint. Complaint, 7 (Count I Wherefore clause); 9 (Count II Wherefore clause).

(4) Whether, by his and/or their trial misconduct, a lawyer-defendant proceeding pro se, and the trial lawyer for his co-defendant employer law firm, may so derail, corrupt, improperly influence, and/or otherwise render unfair the punitive damages phase of a bifurcated trial that a new trial may be awarded as to the punitive damages phase alone, or the trial court may award punitive damages.

Ms. Kanter preserved this matter for appellate review, including during trial on April 30 and May 9, 2002. April 30, 2002 trial tr., 234-81; May 9, 2002 trial tr., 3-4, 16-30, 106-109, 131-33.

(5) Whether—as to a particular issue(s)—defendant may waive entitlement to file a post-trial motion and/or take an appeal from a verdict owing to evidence he elicits and/or arguments he makes to the jury.

Ms. Kanter preserved this matter for appellate review, including during trial on May 13, 2002. May 13, 2002 trial tr., 7-8.

B. *The Following Issues Were Raised by Defendant Epstein in His 1925(b) Statements*

(1) The trial court erred in its March 10, 2003 order in setting aside the jury's finding that defendants were not liable for punitive damages and granting to plaintiff the option of a new trial on the issue of punitive damages or an award of punitive damages in the amount of $645,000 (three times the amount of compensatory damages awarded by the jury) without the necessity of a new trial, where plaintiff's only claim of error with respect to the jury's finding for defendants on the issue of liability for punitive damages was that defendants failed and/or re-

fused to produce financial information ordered by the court, which is a claim that is relevant only to the amount of punitive damages and not defendants' liability therefore, and where use of evidence of a defendant's net worth cannot establish liability for punitive damages. This issue was first presented in the trial court's order of March 10, 2003, granting relief beyond that requested by plaintiff in plaintiff's post-trial motions. Mr. Epstein preserved this issue in defendants' reply brief in opposition to plaintiff's post-trial motion and memorandum of law at 9-16 and in defendants' answer to the rule to show cause and supporting memorandum at 1-12 and further addressed this issue as a claim of error in defendants' motion for stay filed March 13, 2003 at 5. See also, N.T. 5/9/02, pp. 235-36; N.T. 11/25/02, pp. 47-48.

(2) The trial court erred in ordering post-verdict asset discovery of defendants where the jury found that defendants were not liable for punitive damages, and where no new trial had been granted. This issue was first presented in the trial court's order of December 30, 2002. See also, N.T. 11/25/02, pp. 47-48.

(3) The trial court's March 10, 2003 order setting aside the jury's finding that defendants were not liable for punitive damages and granting to plaintiff the option of a new trial on the issue of punitive damages or an award of punitive damages in the amount of $645,000, as to which plaintiff opted for an award of punitive damages in the amount of $645,000 without the necessity of a new trial, deprived defendants of their right to a jury trial on the issue of punitive damages guaranteed under the constitutions of the United States and this Commonwealth. This issue was first presented in the trial court's

order of March 10, 2003, granting relief beyond that requested by plaintiff in plaintiff's post-trial motions. Mr. Epstein preserved this issue in defendants' reply brief in opposition to plaintiff's post-trial motion and memorandum of law at 9-16 and in defendants' answer to the rule to show cause and supporting memorandum at 1-12 and further addressed this issue as a claim of error in defendants' motion for stay filed March 13, 2003 at 5. See also, N.T. 5/9/02, pp. 235-36; N.T. 11/25/02, pp. 47-48.

(4) The trial court's March 10, 2003 order setting aside the jury's finding that defendants were not liable for punitive damages and granting to plaintiff the option of a new trial on the issue of punitive damages or an award of punitive damages in the amount of $645,000, as to which plaintiff opted for an award of punitive damages in the amount of $645,000, without the necessity of a new trial, deprived defendants of their right to due process of law. This issue was first presented in the trial court's order of March 10, 2003, granting relief beyond that requested by plaintiff in plaintiff's post-trial motions. Mr. Epstein preserved this issue in defendants' reply brief in opposition to plaintiff's post-trial motion and memorandum of law at 9-16 and in defendants' answer to the rule to show cause and supporting memorandum at 1-12 and further addressed this issue as a claim of error in defendants' motion for stay filed March 13, 2003 at 5. See also, N.T. 5/9/02, pp. 235-36; N.T. 11/25/02, pp. 47-48.

(5) The trial court erred in setting aside the jury's finding that defendants were not liable for punitive damages and granting plaintiff a new trial on her claim for punitive damages. Mr. Epstein preserved this issue in defend-

ants' reply brief in opposition to plaintiff's post-trial motion and memorandum of law at 9-16 and in defendants' answer to the rule to show cause and supporting memorandum at 1-12 and further addressed this issue as a claim of error in defendants' motion for stay filed March 13, 2003 at 5. See also, N.T. 5/9/02, pp. 235-36; N.T. 11/25/02, pp. 47-48.

(6) The trial court erred in setting aside the jury's finding on compensatory damages and in ordering an additur with respect to the award of compensatory damages to plaintiff. Mr. Epstein preserved this issue in defendants' reply brief in opposition to plaintiff's post-trial motion and memorandum of law at 2-6. See also, N.T. 11/25/02, pp. 41-43, 46.

(7) The trial court erred in setting aside the jury's finding on compensatory damages and ordering an additur with respect to the award of compensatory damages to plaintiff where the evidence produced provided an alternative basis for calculating a damage award based on hourly billings by plaintiff. Mr. Epstein preserved this issue in defendants' reply brief in opposition to plaintiff's post-trial motion and memorandum of law at 2-6. See also, N.T. 11/25/02, pp. 41-43, 46.

(8) The trial court erred in awarding pre-judgment interest where the claim for compensatory damages was not a claim for a readily ascertainable sum. Mr. Epstein preserved this issue in defendants' reply brief in opposition to plaintiff's post-trial motion and memorandum of law at 6-8. See also, N.T. 11/25/02, pp. 40-42.

(9) The trial court committed reversible error in its order of March 10, 2003, by granting plaintiff's requests for post-judgment interest because the verdict was against

the weight of the evidence and plaintiff failed to establish her claims for conversion and breach of contract at the trial as a matter of law. Mr. Epstein preserved this issue before the trial court by arguing contra to plaintiff's requests for pre-judgment interest in defendants' reply brief in opposition to plaintiff's post-trial motion and memorandum of law at 6-8 and by raising this issue at oral argument on the post-trial motions before the trial court. See also, N.T. 11/25/02, pp. 48, 50.

(10) The trial court committed reversible error in its order of March 10, 2003, by granting plaintiff's requests for citations for contempt and directing defendants to pay the court $7,500, and directing defendant Mr. Epstein to pay the plaintiff $26,500, and defendant Spector Gadon & Rosen P.C. to pay plaintiff $53,000 without a formal motion for contempt, without a hearing, and in the absence of any evidence that Mr. Epstein could have produced more information at trial than he did concerning his personal net worth. Mr. Epstein preserved this issue before the trial court by arguing contra to plaintiff's requests for citations for contempt in his opposition to plaintiff's motions for contempt and for attorneys' fees under 42 Pa.C.S. §2503 and by raising this issue at oral argument on the post-trial motions before the trial court. See also, N.T. 5/9/02, pp. 29-30, 107, 178; see also, N.T. 11/25/02, pp. 5-8, 15-16, 19-23, 31-33, 46-48, 57.

(11) The trial court committed reversible error in its orders of December 30, 2002 and January 10, 2003, by granting plaintiff's requests for sensitive post-verdict asset discovery of, inter alia, defendants, Mr. Epstein's wife and Mr. Epstein's accountant. Mr. Epstein preserved this issue before the trial court by arguing contra to plaintiff's requests for discovery throughout defendants'

opposition to post-trial discovery proposed by plaintiff and plaintiff's supplemental memorandum of law regarding the relevancy of Epstein's entireties property and by raising this issue at oral argument on the post-trial motions before the trial court, see (N.T. November 25, 2003, pp. 5-8, 15-16, 19-23, 46-48, 57-59), and by appealing the trial court's December 30, 2002 order to the Superior Court of Pennsylvania on January 9, 2003.

(12) The trial court committed reversible error in its order of March 10, 2003, by finding Mr. Epstein in contempt for failing to comply with the court's January 15, 2003 order. Mr. Epstein preserved this issue before the trial court by arguing contra to plaintiff's requests for discovery pursuant to plaintiff's requests for citations for contempt throughout defendants' opposition to post-trial discovery proposed by plaintiff and plaintiff's supplemental memorandum of law regarding the relevancy of Epstein's entireties property and by raising this issue at oral argument on the post-trial motions before the trial court, see (N.T. November 25, 2003, pp. 4-8, 15-16, 19-22, 56-61), and by appealing the trial court's December 30, 2002 order to the Superior Court of Pennsylvania on January 9, 2003.

(13) The trial court erred in finding defendant Mr. Epstein in contempt of court. Mr. Epstein preserved this issue throughout defendants' answer to the rule to show cause and supporting memorandum and further addressed this issue as a claim of error in defendants' motion for stay filed March 13, 2003 at 5. See also, N.T. 11/25/02, pp. 4-8, 15-16, 19-22, 56-61.

(14) The trial court erred in finding defendant Mr. Epstein in contempt of court where Mr. Epstein did not

violate any clear order of the trial court, and brought in the only document he had relevant to his individual net worth. See N.T. 11/25/02, pp. 5-8, 15-16; see also, N.T. 5/9/02, pp. 29-30, 107, 178.

(15) The trial court erred in allowing plaintiff to pursue the net worth of defendants without having sought discovery of such information or obtaining an order pursuant to Rule 4003.7 of the Pennsylvania Rules of Civil Procedure prior to trial. See N.T. 4/30/02, pp. 235-81; see also, N.T. 11/25/02, p. 7.

(16) The trial court erred in finding defendant Mr. Epstein in contempt of court, and in imposing fines, without a hearing. Mr. Epstein preserved these issues throughout defendants' answer to the rule to show cause and supporting memorandum and further addressed this issue as a claim of error in defendants' motion for stay filed March 13, 2003 at 5. See also, N.T. 11/25/02, pp. 4-8, 15-16, 19-22, 56-61.

(17) The trial court denied Mr. Epstein his constitutional right to due process of law guaranteed under the constitutions of the United States and/or this Commonwealth in finding Mr. Epstein in contempt of court and in imposing fines against Mr. Epstein without a hearing. These issues were first presented in the trial court's order of March 10, 2003, granting relief beyond that requested by plaintiff in plaintiff's post-trial motions. Mr. Epstein preserved this issue throughout defendants' answer to the rule to show cause and supporting memorandum and further addressed this issue as a claim of error in defendants' motion for stay filed March 13, 2003 at 5. See also, N.T. 11/25/02, pp. 4-8, 15-16, 19-22, 56-61.

(18) The trial court erred in imposing attorneys' fees as a sanction against defendant Mr. Epstein, and in doing so without a hearing on either plaintiff's entitlement to attorneys' fees, the reasonableness of such fees, and whether such fees were caused by Mr. Epstein. Mr. Epstein preserved these issues in defendants' answer to the rule to show cause and supporting memorandum at 12-22, in defendants' memorandum of law in opposition to plaintiff's motion for 42 Pa.C.S. §2503 sanctions and supporting memorandum of law at 11, and further addressed this issue as a claim of error in defendants' motion for stay filed March 13, 2003 at 5. See also, N.T. 11/25/02, pp. 4-8, 15-16, 19-22, 26-28, 32-33, 56-61.

(19) The trial court denied Mr. Epstein his constitutional right to due process of law guaranteed under the constitutions of the United States and/or this Commonwealth in imposing attorneys' fees as a sanction against defendant Mr. Epstein without a hearing. Mr. Epstein preserved these issues in defendants' answer to the rule to show cause and supporting memorandum at 12-22 and further addressed this issue as a claim of error in defendants' motion for stay filed March 13, 2003 at 5. See also, N.T. 11/25/02, pp. 4-8, 15-16, 19-22, 56-61.

(20) The trial court erred in issuing its January 10, 2003, January 15, 2003, and March 10, 2003 orders when an automatic supersedeas was in effect pursuant to Pa.R.A.P. 1701 et seq. Mr. Epstein preserved this issue in his motion to vacate and/or reconsider filed March 28, 2003.

(21) The trial court erred in issuing its January 10, 2003, January 15, 2003, and March 10, 2003 orders on

the later-unrealized belief that defendants' appeals filed January 9, 2003, would be quashed.

(22) The jury's verdict that Alan B. Epstein, Esquire, individually entered into an agreement for the payment of a referral fee to Nancy Kanter was contrary to the law of the Commonwealth of Pennsylvania, and against the weight of the evidence. Mr. Epstein preserved these issues in defendants' motion for post-trial relief at ¶¶1-2. See also, N.T. 11/25/02, pp. 48-50.

(23) The jury's verdict that Mr. Epstein was liable for the payment of a referral fee to plaintiff was contrary to the law of the Commonwealth of Pennsylvania, and against the weight of the evidence. These issues were preserved in defendants' motion for post-trial relief at ¶¶3-4, and defendants' memorandum of law in support of their motion for post-trial relief at 23-28, 31-34. See also, N.T. 11/25/02, pp. 48-50.

(24) The evidence presented at trial was insufficient as a matter of law to establish that Mr. Epstein entered into an agreement for the payment of a referral fee to plaintiff, or breached such an agreement. Mr. Epstein preserved these issues in argument on motion for directed verdict, N.T. 5/2/02, pp. 890-91, defendants' motion for post-trial relief at ¶¶5-6, and defendants' memorandum of law in support of their motion for post-trial relief at 31-34, 48-50. See also, N.T. 11/25/02, pp. 48-50.

(25) The jury's verdict with respect to the amount of damages suffered by plaintiff Nancy Kanter was against the weight of the evidence. Mr. Epstein preserved this issue in defendants' motion for post-trial relief at ¶7.

(26) Any agreement for the payment of a referral fee made between plaintiff and Mr. Epstein individually was

unenforceable as a matter of law because plaintiff as guardian ad litem and guardian of the estate of Tara M., as a matter of law, could not contract for or receive a referral fee from the proceeds paid to the estate of Tara M. Mr. Epstein preserved this issue in defendants' motion for post-trial relief at ¶9, and defendants' memorandum of law in support of their motion for post-trial relief at 23-28, 52, and in motion in limine of defendants to preclude certain evidence, which the court denied. See N.T. 4/29/02, p. 3; see also, N.T. 11/25/02, pp. 48-50.

(27) Any agreement for the payment of a referral fee made between plaintiff and Mr. Epstein individually was unenforceable as a matter of law because Mr. Epstein lacked the legal capacity to enter into any such agreement. Mr. Epstein preserved this issue in defendants' motion for post-trial relief at ¶10, and in motion in limine of defendants to preclude certain evidence, which the court denied. See N.T. 4/29/02, p. 3.

(28) Plaintiff was precluded as a matter of law from asserting a claim for a referral fee against Mr. Epstein as an officer or stockholder of Jablon, Epstein, Wolf & Drucker P.C. Mr. Epstein preserved this issue in defendants' motion for post-trial relief at ¶11, and in motion in limine of defendants to preclude certain evidence, which the court denied. See N.T. 4/29/02, p. 3.

(29) The trial court erred in permitting plaintiff to present the expert testimony of James Schwartzman, Esquire, because that testimony (a) went to a legal issue only, on which the trial court had previously ruled, (b) was irrelevant to the issues to be resolved by the jury, and (c) any relevance the testimony might have had was outweighed by its prejudicial effect on defendants. Mr.

Epstein preserved this issue in motion in limine of defendants to preclude certain evidence, pp. 34-36; N.T. 4/29/02, pp. 4-20; N.T. 5/1/02, pp. 610-13; defendants' motion for post-trial relief at ¶14, and defendants' memorandum of law in support of their motion for post-trial relief at 57-64. See also, N.T. 11/25/02, p. 49.

(30) The jury's verdict that Mr. Epstein converted the property of plaintiff was contrary to the law of the Commonwealth of Pennsylvania, and was against the weight of the evidence. Mr. Epstein preserved these issues in defendants' motion for post-trial relief at ¶¶15-16, and defendants' memorandum of law in support of their motion for post-trial relief at 23-28, 52, 54-56. See also, N.T. 11/25/02, pp. 48-50.

(31) The evidence presented at trial was insufficient as a matter of law to establish that Mr. Epstein converted the property of plaintiff. Mr. Epstein preserved this issue in argument on motion for directed verdict, N.T. 5/2/02, pp. 889-949, defendants' motion for post-trial relief at ¶17, and defendants' memorandum of law in support of their motion for post-trial relief at 23-28, 52, 54-56. See also, N.T. 11/25/02, pp. 48-50; N.T. 5/3/02, pp. 1140-48.

(32) As a matter of law, neither Mr. Epstein individually nor SGR converted the property of plaintiff because they were justified in refusing to turn over the referral fee while they litigated her right to such fee in the first instance. Mr. Epstein preserved this issue in defendants' motion for post-trial relief at ¶18, and defendants' memorandum of law in support of their motion for post-trial relief at 54-56. See also, N.T. 11/25/02, pp. 48-50; N.T. 5/2/02, pp. 908, 919-26, 928-29, 931-34.

(33) The jury's verdict with respect to the amount of damages suffered by plaintiff Nancy Kanter arising from any conversion of funds was against the weight of the evidence. Mr. Epstein preserved this issue in defendants' motion for post-trial relief at ¶19. See also, N.T. 11/25/02, pp. 48-50.

(34) The complaint against Mr. Epstein, Esquire, individually and/or Spector Gadon & Rosen P.C. did not set forth a claim for conversion of the property of plaintiff Nancy Kanter. Mr. Epstein preserved this issue in defendants' motion for post-trial relief at ¶20. See also, N.T. 11/25/02, pp. 48-50; see also, N.T. 5/2/02, pp. 889-949.

(35) The trial court erred in permitting the claim of conversion to be considered by the jury and giving a charge on that claim because (a) there was no legal or factual basis for so doing, (b) the charge given was erroneous, and (c) the trial court's actions were prejudicial to the defendants. Mr. Epstein preserved this issue in defendants' proposed jury instruction no. 21; defendants' motion for post-trial relief at ¶21, and defendants' memorandum of law in support of their motion for post-trial relief at 68-70. See also, N.T. 11/25/02, pp. 48-50; N.T. 5/6/02, pp. 1252-54.

(36) The court erred in failing to grant the motions for a directed verdict made during the trial by Mr. Epstein, Esquire, and Spector Gadon & Rosen P.C. Mr. Epstein preserved this issue in defendants' motion for post-trial relief at ¶22. See also, N.T. 5/2/02, pp. 889-932; id., pp. 932-49; N.T. 5/6/02, pp. 1140-56.

(37) The trial court erred in denying the motions in limine filed prior to trial by Mr. Epstein and SGR. Mr.

Epstein preserved this issue in defendants' motion in limine, which the court denied. See N.T. 4/29/02, pp. 3-20.

(38) The trial court erred in admitting evidence relating to the individual liability of Mr. Epstein and his capacity to contract for the payment of a referral fee to plaintiff individually or as an agent of SGR. Mr. Epstein preserved this issue in defendants' motion for post-trial relief at ¶26, and in defendants' motion in limine, which the court denied. See N.T. 4/29/02, p. 3.

(39) The trial court erred in admitting evidence relating to the liability of SGR as a successor or assignee of an agreement for the payment of a referral fee to plaintiff. This issue was preserved in defendants' motion for post-trial relief at ¶27, and in defendants' motion in limine, which the court denied. See N.T. 4/29/02, p. 3.

(40) The trial court erred in commenting to the jury upon the status of plaintiff as guardian ad litem and the guardian of the estate of Tara M. Mr. Epstein preserved this issue in arguments set forth in N.T. 4/29/02, pp. 26-27, 27-34, 117; N.T. 4/30/02, pp. 333, 340-43, 366, 371-73; defendants' motion for post-trial relief at ¶28, and defendants' memorandum of law in support of their motion for post-trial relief at 64-68. See also, N.T. 11/25/02, pp. 49-50.

(41) The trial court erred in restricting defendants' rights to introduce evidence concerning the scope of plaintiff's guardianship of Tara M. Mr. Epstein preserved this issue in N.T. 4/29/02, pp. 26-27, 27-34, 117; N.T. 4/30/02, pp. 333, 340-43, 366, 371-73; defendants' motion for post-trial relief at ¶29, and defendants' memo-

randum of law in support of their motion for post-trial relief at 64-68.

(42) The trial court erred in admitting evidence on the issue of conversion. Mr. Epstein preserved this issue in defendants' motion for post-trial relief at ¶30, and in defendants' motion in limine, which the court denied. See N.T. 4/29/02, p. 3.

(43) The trial court erred in its instructions to the jury when the court referred to Mr. Epstein, it included the professional corporations with which he was associated, in particular Jablon, Epstein, Wolf and Drucker P.C. and SGR. This issue is preserved in the arguments set forth at N.T. 5/6/02, pp. 1424-26, 1428; defendants' motion for post-trial relief at ¶31.a, and defendants' memorandum of law in support of their motion for post-trial relief at 75-76.

(44) The trial court erred in its instructions to the jury when the court instructed the jury that referral fees, which plaintiff was seeking in this case, were common, ordinary and routine, which improperly and wrongfully instructed the jury that guardians of an estate, like plaintiff, were able to simultaneously pursue a case on behalf of their charge, and have a direct pecuniary interest in the outcome. This issue is preserved in the arguments set forth at N.T. 5/3/02, pp. 1205-24; N.T. 5/6/02, pp. 1259-64, 1266-74, 1362-63, 1382, 1397-1400, 1429-34. Defendants' motion for post-trial relief at ¶31.b, and defendants' memorandum of law in support of their motion for post-trial relief at 71-74.

(45) The trial court erred in its instructions to the jury when the court instructed the jury that SGR could be

liable for a referral fee agreement made by Mr. Epstein on any one of five different theories (successor liability, merger, implication, assignment and agency), thereby effectively instructing the jury improperly to find liability against SGR. This issue is preserved in the arguments set forth at N.T. 5/3/02, pp. 1183-95, 1201-1204, 1227-28; N.T. 5/6/02, pp. 1250-51, 1404-1405, 1414-19, 1428, 1437-38; and defendants' motion for post-trial relief at ¶31.c.

(46) The trial court erred in its instructions to the jury when the court instructed the jury that SGR could be liable as a result of the negligence of Mr. Epstein even though negligence was never an issue in the case. This issue is preserved in the arguments set forth at N.T. 5/6/02, pp. 1401-1402, defendants' motion for post-trial relief at ¶31.d, and defendants' memorandum of law in support of their motion for post-trial relief at 76-77. See also, N.T. 11/25/02, p. 51.

(47) The trial court erred in its instructions to the jury when the court instructed the jury that the scope of plaintiff's guardianship of Tara M. was narrowly limited despite an order of the orphans' court to the contrary. Defendants' motion for post-trial relief at ¶31.e.

(48) The trial court erred in its instructions to the jury when the court instructed the jury that Mr. Epstein and/or SGR could be liable for conversion. Defendants' motion for post-trial relief at ¶31.f; and defendants' memorandum of law in support of their motion for post-trial relief at 68-70.

(49) The trial court erred when the court failed to instruct the jury that plaintiff did not have the right as a guardian of Tara M. to enter into an agreement for the

payment to her of a referral fee. This issue is preserved in the arguments set forth at N.T. 5/3/02, pp. 1233-37; defendants' proposed jury instructions no. 18; defendants' motion for post-trial relief at ¶32.b, and defendants' memorandum of law in support of their motion for post-trial relief at 78-79.

(50) Mr. Epstein incorporates any and all matters listed by defendant Spector Gadon & Rosen not listed herein, as well as all citations to the record.

## C. *Defendant SGR Raised the Following Issues in Its 1925(b) Statement*

(1) The trial court erred in granting to plaintiff the option of a new trial on the issue of punitive damages or an award of punitive damages in the amount of $645,000 without the necessity of a new trial, where the plaintiff's only claim of error with respect to the jury's finding for defendant on the issue of liability for punitive damages was that defendants failed and/or refused to produce financial information ordered by the court, which is a claim that is relevant only to the amount of punitive damages and not defendants' liability therefore. SGR preserved this issue in defendants' reply brief in opposition to plaintiff's post-trial motion and memorandum of law at 9-16 and further addressed this issue as a claim of error in defendants' motion for stay filed March 13, 2003 at 5. See also, N.T. 5/9/02, pp. 235-36; N.T. 11/25/02, pp. 47-48.

(2) The trial court's order granting to plaintiff the option of a new trial on the issue of punitive damages or an award of punitive damages in the amount of $645,000, as to which plaintiff opted for an award of punitive dam-

ages in the amount of $645,000 without the necessity of a new trial, deprived defendants of their right to a jury trial on the issue of punitive damages guaranteed under the constitutions of the United States and this Commonwealth. This issue was first presented in the trial court's order of March 10, 2003, granting relief beyond that requested by plaintiff in plaintiff's post-trial motions. Despite this, SGR preserved this issue in defendants' reply brief in opposition to plaintiff's post-trial motion and memorandum of law at 9-16 and further addressed this issue as a claim of error in defendants' motion for stay filed March 13, 2003 at 5. See also, N.T. 5/9/02, pp. 235-36; N.T. 11/25/02, pp. 47-48.

(3) The trial court's order granting to plaintiff the option of a new trial on the issue of punitive damages or an award of punitive damages in the amount of $645,000, as to which plaintiff opted for an award of punitive damages in the amount of $645,000, without the necessity of a new trial, deprived defendants of their right to a due process of law. This issue was first presented in the trial court's order of March 10, 2003, granting relief beyond that requested by plaintiff in plaintiff's post-trial motions. Despite this, SGR preserved this issue in defendants' reply brief in opposition to plaintiff's post-trial motion and memorandum of law at 9-16 and further addressed the issue in defendants' motion for stay filed March 13, 2003 at 5. See also, N.T. 5/9/02, pp. 235-36; N.T. 11/25/ 02, pp. 47-48.

(4) The trial court erred in granting plaintiff a new trial on her claim for punitive damages. SGR preserved this issue in defendants' reply brief in opposition to plaintiff's post-trial motion and memorandum of law at

9-16 and further addressed this issue as a claim of error in defendants' motion for stay filed March 13, 2003 at 5. See also, N.T. 5/9/02, pp. 235-36; N.T. 11/25/02, pp. 47-48.

(5) The trial court erred in ordering post-verdict asset discovery of defendants where the jury found defendants were not liable for punitive damages, where no viable issue for a new trial on punitive damages was raised and where no new trial as to punitive damages had been ordered. SGR preserved this issue in defendants' reply brief in opposition to plaintiff's post-trial motion and memorandum of law at 9-16 and further addressed this issue as a claim of error in defendants' motion for stay filed March 13, 2003 at 5. See also, N.T. 5/9/02, pp. 235-36; N.T. 11/25/02, pp. 47-48.

(6) The trial court erred in ordering an additur with respect to the award of compensatory damages to plaintiff. SGR preserved this issue in defendants' reply brief in opposition to plaintiff's post-trial motion and memorandum of law at 2-6. See also, N.T. 11/25/02, pp. 41-43, 46.

(7) The trial court erred in ordering an additur with respect to the award of compensatory damages to plaintiff where the evidence produced provided an alternative basis for calculating a damage award based on hourly billings by plaintiff. SGR preserved this issue in defendants' reply brief in opposition to plaintiff's post-trial motion and memorandum of law at 2-6. See also, N.T. 11/25/02, pp. 41-43, 46.

(8) The trial court erred in awarding pre-judgment interest where the claim for compensatory damages was not a claim for a readily ascertainable sum. SGR pre-

served this issue in defendants' reply brief in opposition to plaintiff's post-trial motion and memorandum of law at 6-8. See also, N.T. 11/25/02, pp. 40-42.

(9) The trial court committed reversible error in its order of March 10, 2003, by granting plaintiff's requests for post-judgment interest because the verdict was against the weight of the evidence and plaintiff failed to establish her claims for conversion and breach of contract at the trial as a matter of law. SGR preserved this issue before the trial court by arguing contra to plaintiff's requests for pre-judgment interest in defendants' reply brief in opposition to plaintiff's post-trial motion and memorandum of law at 8-9 and by raising this issue at oral argument on the post-trial motions before the trial court. See also, N.T. 11/25/02, p. 42.

(10) The trial court committed reversible error in its order of March 10, 2003, by granting plaintiff's requests for citations for contempt and directing defendants to pay the court $7,500, and directing defendant Alan B. Epstein, Esquire, to pay the plaintiff $26,500, and defendant SGR to pay plaintiff $53,000 without a formal motion for contempt and without a hearing. SGR preserved this issue before the trial court by arguing contra to plaintiff's requests for citations for contempt in its opposition to plaintiff's motions for contempt and for attorneys' fees under 42 Pa.C.S. §2503 and by raising this issue at oral argument on the post-trial motions before the trial court. See also, N.T. 11/25/02, pp. 4-8, 15-16, 19-22.

(11) The trial court committed reversible error in its orders of December 30, 2002 and January 10, 2003, by granting plaintiff's requests for discovery pursuant to

plaintiff's requests for citations for contempt. SGR preserved this issue before the trial court by arguing contra to plaintiff's requests for discovery pursuant to plaintiffs' requests for citations for contempt in defendant's opposition to post-trial discovery proposed by plaintiff and plaintiff's supplemental memorandum of law regarding the relevancy of Epstein's entireties property and by raising this issue at oral argument on the post-trial motions before the trial court. See also, N.T. 11/25/02, pp. 4-8, 15-16, 19-22, 56-61.

(12) The trial court committed reversible error in its order of March 10, 2003, by finding SGR in contempt for failing to comply with the court's January 15, 2003 order. SGR preserved this issue before the trial court by arguing contra to plaintiff's requests for discovery pursuant to plaintiff's requests for citations for contempt in defendants' opposition to post-trial discovery proposed by plaintiff and plaintiff's supplemental memorandum of law regarding the relevancy of Epstein's entireties property and by raising this issue at oral argument on the post-trial motions before the trial court. See also, N.T. 11/25/02, pp. 4-8, 15-16, 19-22, 56-61.

(13) The trial court erred in finding defendant SGR in contempt of court because (1) the order allegedly violated was not clear, definite and specific and/or (2) there was an absence of any evidence that defendants violated the order, and/or (3) assuming arguendo a violation of an order of the court, there was an absence of any evidence that defendants willfully violated the order. SGR preserved this issue in defendants' answer to the rule to show cause and supporting memorandum at 10-12, and further addressed this issue as a claim of error in defen-

dants' motion for stay filed March 13, 2003 at 5. See also, N.T. 11/25/02, pp. 4-8, 15-16, 19-22, 56-61.

(14) The trial court erred in finding defendant SGR in contempt of court without a hearing. SGR preserved this issue in defendants' answer to the rule to show cause and supporting memorandum at 1-12 and further addressed this issue as a claim of error in defendants' motion for stay filed March 13, 2003 at 5. See also, N.T. 11/25/02, pp. 4-8, 15-16, 19-22, 56-61.

(15) The trial court denied defendant its constitutional right to due process of law guaranteed under the constitutions of the United States and/or this Commonwealth in finding defendant SGR in contempt of court. This issue was first presented in the trial court's order of March 10, 2003, granting relief beyond that requested by plaintiff in plaintiff's post-trial motions. SGR preserved this issue in defendants' answer to the rule to show cause and supporting memorandum at 1-12 and further addressed this issue as a claim of error in defendants' motion for stay filed March 13, 2003 at 5. See also, N.T. 11/25/02, pp. 4-8, 15-16, 19-22, 56-61.

(16) The trial court erred in imposing fines on defendant SGR for contempt of court without a hearing. This issue was first presented in the trial court's order of March 10, 2003, granting relief beyond that requested by plaintiff in plaintiff's post-trial motions. Despite this, SGR preserved this issue in defendants' answer to the rule to show cause and supporting memorandum at 1-12 and further addressed this issue as a claim of error in defendants' motion for stay filed March 13, 2003 at 5. See also, N.T. 11/25/02, pp. 4-8, 15-16, 19-22, 56-61.

(17) The trial court denied defendant its constitutional right to due process of law guaranteed under the constitutions of the United States and/or this Commonwealth in imposing fines on defendant SGR for contempt of court without a hearing. This issue was first presented in the trial court's order of March 10, 2003, granting relief beyond that requested by plaintiff in plaintiff's post-trial motions. Despite this, SGR preserved this issue in defendants' answer to the rule to show cause and supporting memorandum at 1-12 and further addressed this issue as a claim of error in defendants' motion for stay filed March 13, 2003 at 5. See also, N.T. 11/25/02, pp. 4-8, 15-16, 19-22, 56-61.

(18) The trial court erred in imposing attorneys' fees as a sanction against defendant SGR without any evidence presented as to entitlement to attorneys' fees, the reasonableness of such fees or whether such fees were the result of conduct by SGR. SGR preserved this issue in defendants' answer to the rule to show cause and supporting memorandum at 12-22, in defendants' memorandum of law in opposition to plaintiff's motion for 42 Pa.C.S. §2503 sanctions and supporting memorandum of law at 11, and further addressed this issue as a claim of error in defendants' motion for stay filed March 13, 2003 at 5. See also, N.T. 11/25/02, pp. 30-33, 56-58.

(19) The trial court erred in imposing attorneys' fees as a sanction against defendant SGR without a hearing. SGR preserved this issue in defendants' answer to the rule to show cause and supporting memorandum at 12-22, in defendants' memorandum of law in opposition to plaintiff's motion for 42 Pa.C.S. §2503 sanctions and supporting memorandum of law at 11, and further ad-

dressed this issue as a claim of error in defendants' motion for stay filed March 13, 2003 at 5. See also, N.T. 11/25/02, pp. 30-33, 56-58.

(20) The trial court denied defendant its constitutional right to due process of law guaranteed under the constitutions of the United States and/or this Commonwealth in imposing attorneys' fees as a sanction against defendant SGR without a hearing. SGR preserved this issue in defendants' answer to the rule to show cause and supporting memorandum at 12-22, and further addressed this issue as a claim of error in defendants' motion for stay filed March 13, 2003 at 5. See also, N.T. 11/25/02, pp. 30-33, 56-58.

(21) The trial court erred in issuing its March 10, 2003 order when a supersedeas was in effect pursuant to Pa.R.A.P. 1701 et seq. SGR preserved this issue in its motion to vacate filed March 28, 2003.

(22) The trial court erred in issuing its January 15, 2003 order when a supersedeas was in effect pursuant to Pa.R.A.P. 1701 et seq. SGR preserved this issue in its motion to vacate filed March 28, 2003.

(23) The trial court erred in issuing its January 10, 2003 order when a supersedeas was in effect pursuant to Pa.R.A.P. 1701 et seq. SGR preserved this issue in its motion to vacate filed March 28, 2003.

(24) The jury's verdict that SGR was liable for the payment of a referral fee to plaintiff was contrary to the law of the Commonwealth of Pennsylvania. This issue was preserved in defendants' motion for post-trial relief at ¶3, and defendants' memorandum of law in support of their motion for post-trial relief at 23-28. See also, N.T. 11/25/02, pp. 48-49.

(25) The jury's verdict that SGR was liable for the payment of a referral fee to plaintiff was against the weight of the evidence. SGR preserved this issue in defendants' motion for post-trial relief at ¶4, and defendants' memorandum of law in support of their motion for post-trial relief at 31-34. See also, N.T. 11/25/02, pp. 48-49.

(26) The evidence presented at trial was insufficient as a matter of law to establish that SGR entered into an agreement for the payment of a referral fee to plaintiff. SGR preserved this issue in argument on motion for directed verdict, N.T. 5/2/02, pp. 890-91, defendants' motion for post-trial relief at ¶5, and defendants' memorandum of law in support of their motion for post-trial relief at 31-34, 48-50. See also, N.T. 11/25/02, pp. 48-49.

(27) The evidence presented at trial was insufficient as a matter of law to establish that SGR breached an agreement for the payment of a referral fee to plaintiff. SGR preserved this issue in argument on motion for directed verdict, N.T. 5/2/02, pp. 890-91, defendants' motion for post-trial relief at ¶6, and defendants' memorandum of law in support of their motion for post-trial relief at 31-34, 48-50. See also, N.T. 11/25/02, pp. 48-49.

(28) Any agreement for the payment of a referral fee made between plaintiff and Alan B. Epstein, Esquire, individually, was unenforceable as a matter of law because plaintiff as guardian ad litem and guardian of the estate of Tara M., as a matter of law could not contract for or receive a referral fee from the proceeds paid to the estate of Tara M. SGR preserved this issue in defendants' motion for post-trial relief at ¶9, and defendants' memo-

randum of law in support of their motion for post-trial relief at 23-28, 52. See also, N.T. 11/25/02, pp. 48-49.

(29) Any agreement for the payment of a referral fee made between plaintiff and Alan B. Epstein, Esquire, individually, was unenforceable as a matter of law because Epstein lacked the legal capacity to enter into any such agreement. SGR preserved this issue in defendants' motion for post-trial relief at ¶10.

(30) Plaintiff was precluded as a matter of law from asserting a claim for a referral fee against Alan B. Epstein, Esquire, as an officer or stockholder of Jablon, Epstein, Wolf & Drucker P.C. SGR preserved this issue in defendants' motion for post-trial relief at ¶11.

(31) As a matter of law, SGR was not an assignee or successor in interest or otherwise obligated under any agreement made for the payment of a referral fee to plaintiff. SGR preserved this issue in defendants' motion for post-trial relief at ¶12, and defendants' memorandum of law in support of their motion for post-trial relief at 44-47.

(32) There was insufficient evidence produced at trial to establish that, as a matter of fact, SGR was an assignee or successor in interest to any agreement made for the payment of a referral fee to plaintiff. SGR preserved this issue in defendants' motion for post-trial relief at ¶13, and defendants' memorandum of law in support of their motion for post-trial relief at 44-47.

(33) The jury's verdict with respect to the damages awarded to plaintiff was against the weight of the evidence. Defendants' motion for post-trial relief at ¶¶7, 19.

(34) There was insufficient evidence to support the jury's award of damages to plaintiff.

(35) The trial court erred in permitting plaintiff to present the expert testimony of James Schwartzman, Esquire, because that testimony (a) went to a legal issue only, on which the trial court had previously ruled, (b) was irrelevant to the issues to be resolved by the jury, and (c) any relevance the testimony might have had was outweighed by its prejudicial effect on defendants. SGR preserved this issue in motion in limine of defendants to preclude certain evidence, pp. 34-36; N.T. 4/29/02, pp. 4-20; N.T. 5/1/02, pp. 610-13; defendants' motion for post-trial relief at ¶14; and defendants' memorandum of law in support of their motion for post-trial relief at 57-64. See also, N.T. 11/25/02, p. 49.

(36) The jury's verdict that SGR converted the property of plaintiff was contrary to the law of the Commonwealth of Pennsylvania. SGR preserved this issue in defendants' motion for post-trial relief at ¶15, and defendants' memorandum of law in support of their motion for post-trial relief at 23-28, 52, 54-56.

(37) The jury's verdict that SGR tortiously converted the property of plaintiff was against the weight of the evidence. SGR preserved this issue in defendants' motion for post-trial relief at ¶16, and defendants' memorandum of law in support of their motion for post-trial relief at 54-56.

(38) The evidence presented at trial was insufficient as a matter of law, to establish that SGR converted the property of plaintiff. SGR preserved this issue in argument on motion for directed verdict, N.T. 5/2/02, pp. 89-92, 895-97, 903-905, 906-16, 916-21, 921-23, defendants' motion for post-trial relief at ¶17, and defendants' memorandum of law in support of their motion for post-trial relief at 23-28, 52, 54-56.

(39) As a matter of law, neither Alan B. Epstein, Esquire, individually, nor SGR converted the property of plaintiff because they were justified in refusing to turn over the referral fee while they litigated her right to such fee in the first instance. SGR preserved this issue in defendants' motion for post-trial relief at ¶18, and defendants' memorandum of law in support of their motion for post-trial relief at 54-56.

(40) The trial court erred in permitting the claim of conversion to be considered by the jury and giving a charge on that claim because (a) there was no legal or factual basis for so doing, (b) the charge given was erroneous, and (c) the trial court's actions were prejudicial to the defendants. SGR preserved this issue in arguments set forth in defendants' proposed jury instruction no. 21, defendants' motion for post-trial relief at ¶21, and defendants' memorandum of law in support of their motion for post-trial relief at 68-70.

(41) The trial court erred in denying the motions in limine filed prior to trial by Alan B. Epstein, Esquire, and SGR. SGR preserved this issue in defendants' motion in limine.

(42) The trial court erred in admitting evidence relating to the individual liability of Alan B. Epstein, Esquire, and his capacity to contract for the payment of a referral fee to plaintiff individually or as an agent of SGR. SGR preserved this issue in defendants' motion for post-trial relief at ¶26.

(43) The trial court erred in admitting evidence relating to the liability of SGR as a successor or assignee of an agreement for the payment of a referral fee to plain-

tiff. SGR preserved this issue in defendants' motion for post-trial relief at ¶27.

(44) The trial court erred in commenting to the jury upon the status of plaintiff as guardian ad litem and the guardian of the estate of Tara M. SGR preserved this issue in arguments set forth in N.T. 4/29/02, pp. 26-27, 27-34, 117; N.T. 4/30/02, pp. 333, 340-43, 366, 371-73; defendants' motion for post-trial relief at ¶28, and defendants' memorandum of law in support of their motion for post-trial relief at 64-68. See also, N.T. 11/25/02, pp. 49-50.

(45) The trial court erred in restricting defendants' rights to introduce evidence concerning the scope of plaintiff's guardianship of Tara M. SGR preserved this issue in N.T. 4/29/02, pp. 26-27, 27-34, 117; N.T. 4/30/02, pp. 333, 340-43, 366, 371-73; defendants' motion for post-trial relief at ¶29, and defendants' memorandum of law in support of their motion for post-trial relief at 64-68. See also, N.T. 11/25/02, pp. 48-49.

(46) The trial court erred in admitting evidence on the issue of conversion. SGR preserved this issue in defendants' motion for post-trial relief at ¶30.

(47) The trial court erred in its instructions to the jury when the court referred to Alan Epstein, it included the professional corporations with which he was associated, in particular Jablon, Epstein, Wolf and Drucker P.C. and SGR. This issue is preserved in the arguments set forth at N.T. 5/6/02, pp. 1424-26, 1428, defendants' motion for post-trial relief at ¶31.a, and defendants' memorandum of law in support of their motion for post-trial relief at 75-76.

(48) The trial court erred in its instructions to the jury when the court instructed the jury that referral fees, which plaintiff was seeking in this case, were common, ordinary and routine, which improperly and wrongfully instructed the jury that guardians of an estate like plaintiff, were able to simultaneously pursue a case on behalf of their charge, and have a direct pecuniary interest in the outcome. This issue is preserved in the arguments set forth at N.T. 5/3/02, pp. 1205-24; N.T. 5/6/02, pp. 1259-64, 1266-74, 1362-63, 1382, 1397-1400, 1429-34, defendants' motion for post-trial relief at ¶31.b, and defendants' memorandum of law in support of their motion for post-trial relief at 71-74. See also, N.T. 11/25/02, p. 50.

(49) The trial court erred in its instructions to the jury when the court instructed the jury that SGR could be liable for a referral fee agreement made by Alan Epstein on any one of five different theories (successor liability, merger, implication, assignment and agency), thereby effectively instructing the jury improperly to find liability against SGR. This issue is preserved in the arguments set forth at N.T. 5/3/02, pp. 1183-95, 1201-1204, 1227-28; N.T. 5/6/02, pp. 1250-51, 1404-1405, 1414-19, 1428, 1437-38, defendants' motion for post-trial relief at ¶31.c. See also, N.T. 11/25/02, p. 50.

(50) The trial court erred in its instructions to the jury when the court instructed the jury that SGR could be liable as a result of the negligence of Alan Epstein even though negligence was never at issue in the case. This issue is preserved in the arguments set forth at N.T. 5/6/02, pp. 1401-1402, defendants' motion for post-trial relief at ¶31.d, and defendants' memorandum of law in

support of their motion for post-trial relief at 76-77. See also, N.T. 11/25/02, p. 51.

(51) The trial court erred in its instructions to the jury when the court instructed the jury that the scope of plaintiff's guardianship of Tara M. was narrowly limited despite an order of the orphans' court to the contrary. Defendants' motion for post-trial relief at ¶31.e. See also, N.T. 11/25/02, pp. 51-52.

(52) The trial court erred in its instructions to the jury when the court instructed the jury that Alan Epstein and/or SGR could be liable for conversion. Defendants' motion for post-trial relief at ¶31.f and defendants' memorandum of law in support of their motion for post-trial relief at 68-70.

(53) The trial court erred when the court failed to instruct the jury that plaintiff did not have the right as a guardian of Tara M. to enter into an agreement for the payment to her of a referral fee. This issue is preserved in the arguments set forth at N.T. 5/3/02, pp. 1233-37; defendants' proposed jury instructions no. 18; defendants' motion for post-trial relief at ¶32.b; and defendants' memorandum of law in support of their motion for post-trial relief at 78-79.

(54) The trial court erred in submitting plaintiff's claim for breach of contract to the jury because plaintiff never pleaded a claim for breach of contract in her complaint. SGR raised this issue in its motion in limine at 17-18 and in defendants' motion for post-trial relief at ¶8, and defendants' memorandum of law in support of their motion for post-trial relief at 30-32. See also, N.T. 11/25/02, pp. 48-49.

(55) The trial court erred in submitting plaintiff's claim for conversion to the jury because plaintiff never pleaded a claim for conversion in her complaint. SGR raised this issue in its motion in limine at 17-18 and in defendants' motion for post-trial relief at ¶20, and defendants' memorandum of law in support of their motion for post-trial relief at 30-32. See also, N.T. 11/25/02, pp. 48-49.

(56) SGR incorporates herein any arguments raised in co-defendant Alan Epstein's statement of matters complained of on appeal.

## III. PRELIMINARY STATEMENT BY THE COURT

This case is about *improper behavior* by an attorney, defendant Alan B. Epstein and the law firm with which he was a partner, Spector Gadon & Rosen P.C., arising out of an agreement to pay a referral fee to plaintiff.

During the course of this litigation, the defendants continued their pattern of improper behavior: they ignored verbal orders from this court to provide documents during the punitive damages stage of the trial; they did not provide ordered discovery during the post-trial period; and they took judgment and filed an appeal after they agreed in open court to an extension of Pa.R.C.P. 227.4(b). Finally, we served on defendants 1925(b) orders, mandating that they *set forth issues that they actually intend to raise on appeal.* We gave counsel a full month to make these determinations. Nevertheless, counsel for *defendant Epstein responded by setting forth 49 issues and counsel for defendant SGR raised 55 issues, in addition to an incorporation* by reference of the issues set forth by each other, *for a total of 104 issues each.*

This went beyond lawyering, and was *another attempt to overwhelm and overburden this court and pervert the court system.*

## IV. DISCUSSION

### A. *Authority of the Court To Act*

Defendants contend that we had no authority to issue orders after they filed notices of appeal on January 9, 2003.

We believed, at the time, that the appeals filed by the defendants should have been quashed by the Superior Court as premature.

On November 25, 2002, the defendants agreed in open court to an extension of Pa.R.C.P. 227.4 to March 14, 2003. The agreement was transcribed by the court reporter and is clear and unambiguous. Therefore, the court had until that date to act on the various motions for post-trial relief. We believe that defendants acted improperly when they filed praecipes to enter judgment on January 8, 2003, and filed two notices of appeal on January 9, 2003.[3]

On January 10, 2003 and January 15, 2003, we issued orders relating to post-trial discovery and defendants filed appeals of those orders.[4]

On January 16, 2003, the defendants filed with the Superior Court a "Petition for the issuance of a writ of prohibition restraining the Honorable Joseph I. Papalini

---

3. 186 EDA 2003; 187 EDA 2003.
4. 300 EDA 2003; 301 EDA 2003. Both appeals were subsequently quashed.

from exceeding jurisdiction of his court and petition for expedited consideration." On January 22, 2003, we wrote to the prothonotary of the Superior Court with a copy to Superior Court Judge Robert Graci, requesting that the appeals be quashed as premature. *On January 22, 2003, Judge Graci denied the defendants' petition for the issuance of a writ of prohibition.* On January 24, 2003, plaintiff filed a motion in Superior Court to quash all of defendants' appeals.

On March 10, 2003, we issued our order disposing of the post-trial issues.

On March 25, 2003, the Superior Court quashed appeals 300 EDA 2003 and 301 EDA 2003, and on March 26, 2003, the court quashed appeals no. 299 EDA 2003 and 302 EDA 2003. On March 25, 2003, the court denied the plaintiff's motion to quash appeals 186 EDA 2003 and 187 EDA 2003, without prejudice to the right of plaintiff to raise the procedural issue when they argue the merits of the appeals.

Thus, it was not until March 25, 2003, that we were actually on notice that our jurisdiction to act was circumscribed by Pa.R.A.P. 1701.

All of our orders relating to this case were filed prior to March 14, 2003, the Rule 227.4 extension date, with the exception of our order of April 11, 2003, which was issued in response to *defendants'* motions which were filed on March 13, 2003 and March 28, 2003.

## B. *Sufficiency and Weight of the Evidence*

The defendants asserted that breach of contract was not alleged in plaintiff's complaint; therefore there could be no recovery.

They also asserted that there was insufficient evidence to support the decision of the jury that there was a contract between plaintiff and defendant Epstein and that the decision of the jury was against the weight of the evidence.

A trial court must enter judgment notwithstanding the verdict only if the movant is entitled to judgment as a matter of law or if the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. A lower court's grant or denial of a judgment notwithstanding the verdict will be disturbed only for an abuse of discretion or an error of law. *Lockwood v. City of Pittsburgh,* 561 Pa. 515, 519, 751 A.2d 1136, 1138 (2000); *Moure v. Raeuchle,* 529 Pa. 394, 402, 604 A.2d 1003, 1007 (1992).

A new trial should be awarded on the ground that the verdict is against the weight of the evidence when the verdict of the jury is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. *Gunn v. Grossman,* 748 A.2d 1235 (Pa. Super. 2000), *appeal denied,* 564 Pa. 700, 764 A.2d 1070 (2000); *Martin v. Evans,* 551 Pa. 496, 501, 711 A.2d 458, 461 (1998); *Houseknecht v. Walters,* 404 Pa. Super. 85, 590 A.2d 20 (1991); *Kopeika v. Medical Services Association,* 347 Pa. Super. 500, 500 A.2d 1168 (1985); *Ditz v. Marshall,* 259 Pa. Super. 31, 393 A.2d 701 (1978).

The evidence presented by plaintiff was as follows: This action arose from an underlying federal civil rights action which was brought on behalf of Tara M., who was born on April 10, 1987. When she was still an infant, she was placed in the custody of the City of Philadelphia

and was placed in a series of foster homes. In 1990, Tara M. was legally separated from her mother and in 1991, Philadelphia Family Court appointed plaintiff as the child advocate attorney for the child. In 1996, Tara M. was attacked and horribly abused by the foster family with whom she was living. While she was hospitalized, cash donations in the amount of $830 were made on her behalf by the general public.

Plaintiff petitioned the orphans' court of Philadelphia to set up a bank account for the donations. On March 19, 1996, Judge Kathryn S. Lewis, appointed plaintiff as guardian ad litem of Tara M. *solely* for the purposes of setting up the bank account to deposit the public donations. In April of 1996, Judge Lewis issued a second order, authorizing plaintiff to receive the $830. The funds were to be held in the account until Tara M. reached the age of 18, or there was a further order of the court. Other than establishing the custodial account, plaintiff had no further duties as guardian ad litem of any aspect of Tara M.'s affairs.

Plaintiff determined that a civil suit should be brought on behalf of Tara M. She decided to refer the matter to an experienced litigator of civil rights cases. Plaintiff interviewed two such litigators. She met with defendant Epstein in March of 1996. A follow-up meeting took place in April of 1996. Epstein indicated that if he agreed to take the case, his fee would be one third of the recovery or the hourly charges, whichever was greater. *At that point, plaintiff told Epstein that she wanted a one third referral fee, which would be taken from Epstein's fees, and he agreed to that.* (N.T. 4/29/02, pp. 133-34.) One of plaintiff's motivations in asking for the referral fee

was her belief that the City of Philadelphia would retaliate against her for bringing suit against it.

In July of 1996, a formal agreement for defendant Epstein to represent Tara M. was signed by plaintiff and defendant Epstein, on behalf of his law firm Jablon, Epstein, Wolf & Drucker P.C. That contract did not set forth the terms of the oral referral fee agreement nor was the referral fee agreement ever committed to writing. (N.T. 146-47.)

There were numerous exchanges of letters and information between plaintiff and defendant Epstein about the case, until February 1997, when Epstein filed a complaint in the United States District Court for the Eastern District of Pennsylvania, captioned *Tara M., by the Guardian of her Estate, Nancy Kanter, Plaintiff v. City of Philadelphia et al., Defendants,* civil action no. 97-1041. The city then joined plaintiff as a third-party defendant, which she believed was retaliation against her for bringing the suit. Plaintiff continued to assist defendant Epstein with the suit, and Epstein never indicated that he thought there was a conflict of interest; he discussed the referral fee with her several times. (N.T. 169-71.)

In 1998, Epstein disbanded Jablon, Epstein, Wolf & Drucker P.C. and he merged his practice with the firm of Spector Gadon & Rosen P.C., where he became a partner. (N.T. 171-73.) The Tara M. litigation continued and plaintiff continued to work on the case with Epstein. The case went to mediation and plaintiff attended the sessions with Epstein. (N.T. 179.)

In 2000, Tara M. was adopted by her foster mother, Iris Rosario. At that point, her case was dismissed from

dependency court and plaintiff's service as her child advocate was at an end. Months later, Ms. Rosario was substituted as the new named plaintiff in the Tara M. case. (N.T. 185-86.)

*The Tara M. action was settled for $4,310,000.* Plaintiff's malpractice insurance carrier contributed $10,000 to the settlement, as per a demand made by the city. The settlement contribution on behalf of plaintiff was made by her carrier without her agreement. *The settlement agreement preserved plaintiff's right to make future claims in state court for her referral fee.* (N.T. 4/29/02, pp. 189-90, 219, 229-30.) *The firm, SGR received a fee of $1,293,000* and reimbursement of costs in the amount of $20,705.50. (N.T. 4/30/02, p. 315.)

After the Tara M. case was settled, *Epstein first offered plaintiff alternative payment of her referral fee, which would have come out of Tara M.'s share of the recovery. Plaintiff declined that offer.* (N.T. 4/29/02, pp. 203-205.) Plaintiff received no referral fee from either Epstein or SGR. (N.T. 4/30/02, p. 303.)

In addition to plaintiff's testimony about the referral fee, *Michael Forbes, Esquire,* testified that he attended a meeting with Epstein and plaintiff and that *Epstein unequivocally promised* to pay plaintiff the one-third referral fee. (N.T. 5/1/02, pp. 640-44.) *Jeffery Albert, Esquire,* also testified that Epstein *acknowledged that there was an agreement* between him and plaintiff to pay her a fee. (N.T. 691-92.)

Thus, there was sufficient evidence presented from which the jury could conclude that Epstein agreed to pay plaintiff a *referral fee* which amounted to *$431,000,* which was one-third of the fee recovered by his firm on

behalf of Tara M. We also concluded that the finding of the jury that a contract existed between plaintiff and defendant Epstein was not against the weight of the evidence.

There was also sufficient evidence presented that the firm SGR actually received the contingency fee in this case and withheld payment from plaintiff.

*We concluded* that defendant Epstein could not enter into a fee referral agreement on behalf of himself and the law firm of which he was a partner, disband the partnership, join another firm as a partner, and avoid payment to plaintiff. Defendant SGR was bound by the agreement between plaintiff and defendant Epstein. Therefore, defendant SGR was equally liable to plaintiff for breach of contract.

*We also concluded* that the evidence supported the finding of the jury that both defendants were liable in conversion.

" 'Conversion is the deprivation of another's right of property in, or use or possession of, a chattel without . . . lawful justification.' . . . 'Money may be the subject of conversion.' . . . [The] failure to pay a debt is not conversion. . . . [O]nce a [referral] fee has been received, the referral fee can be the subject of a conversion. Furthermore, the attorney's law firm can be vicariously liable for conversion." *Bernhardt v. Needleman,* 705 A.2d 875, 878-79 (Pa. Super. 1997).

In the case at bar, there was sufficient evidence from which the jury found that there was a valid referral agreement between plaintiff and defendant Epstein and that Epstein intentionally refused to pay plaintiff what was due her after the Tara M. settlement. The defendant law

firm SGR was aware of the fee dispute and also made a conscious decision not to pay plaintiff without even meeting with her personally. Therefore, SGR was liable in conversion both directly and vicariously.

We also concluded that plaintiff was not legally precluded from receiving the referral fee because she was Tara M.'s child advocate and guardian ad litem, because the referral fee was supposed to come from the defendants' share of the settlement, not the child's. We also concluded that the referral fee agreement did not become invalid simply because plaintiff was subsequently named as an additional defendant in the law suit and a settlement was tendered on her behalf by her legal malpractice carrier.

Furthermore, these issues were also presented to the jury, which nevertheless found in plaintiff's favor.

Moreover, although not presented to the jury, there was additional testimony offered to this court in camera *without the jury present,* which showed defendant Epstein's acknowledgement that he did owe plaintiff a referral fee.

The witness was Samuel C. Stretton, Esquire, an attorney specializing in attorney ethics:

"Mr. Bochetto: Mr. Stretton is going to testify that at about the time that Nancy met with Alan Epstein originally, that she called Sam to make sure that it was okay that she took a referral fee as the child advocate. She explained all the circumstances to him and he said yes. I think it's okay." (N.T. 4/30/02, p. 356.)

"Mr. Bochetto: Mr. Stretton was a colleague in the bar, he's well-known to specialize in attorney ethics, and he

was called as a professional matter. . . . and that he spoke with Alan Epstein and Alan Epstein admitted to Sam that yes, there was an understanding to pay Nancy a fee, but that his partners at Spector Gadon & Rosen were giving him a hard time." (N.T. 4/30/02, p. 357.)

"Mr. Bochetto: And during that conversation Mr. Epstein acknowledged that he did have an understanding to pay a fee to Ms. Kanter. That's not settlement negotiations." (N.T. 4/30/02, p. 359.)

"Mr. Bochetto: I am going to limit my questions to the circumstances under which Mr. Stretton had conversations with Mr. Epstein to see if they were formal settlement negotiations or simply conversations by professional colleagues. Okay?" (N.T. 4/30/02, p. 361.)

"The Witness: Samuel C. Stretton, S-T-R-E-T-T-O-N.

"The Court: For the record, please note that the examination is being conducted in limine without the jury being present. Go ahead.

"Direct Examination

"By Mr. Bochetto:

"Q: Good morning, Mr. Stretton . . . .

"Q: In or around March of 2001 did you have a conversation with Mr. Epstein?

"A: . . . I knew Alan for years. I knew Nancy for years. She and I worked together with the criminal justice committee section when I was chairman and she was very active with the family section that we had created. I knew Alan Epstein since about 1975. He was a good friend of mine, and is, as is Nancy. Nancy asked me to call him to attempt to resolve the issues, so I placed a telephone— . . .

"[T]hen she chose to retain your services and then I sent the file over.

"There was a second conversation, which was last year when I was sitting one morning at a restaurant having a cup of coffee waiting until the court system opened, and Alan Epstein walked by and came in and we talked again . . . .

"Q: Now, that second conversation was after a time when I was already representing Nancy Kanter, is that correct?

"A: That it was.

"Q: And you made no representations to Mr. Epstein at that time that you were representing Miss Kanter, did you?

"A: At that time he knew I wasn't. We just talked as friends because we wanted to try to resolve it, we felt bad they were fighting over it.

"Q: Let me focus on that, when you were talking as friends. During that conversation *did he acknowledge to you that yes, there had been an understanding to pay Nancy Kanter fees in connection with the Tara M. federal case?*

"A: That was during the first conversation he had during the two-week time period, *there was an acknowledgment.*

"Q: How about during the second conversation?

"A: During the second conversation it was focused on how can we resolve this because he still wanted to pay monies to Nancy because he felt bad about the situation, and he thought the world of Nancy Kanter and he enjoyed her friendship, and so he and I tried to craft an

idea, and then I called Nancy and the idea essentially was that she would be appointed as guardian or some role and that she would be paid substantial fees, into six figures for that particular role. . . .

"[W]e were all friends and it's not worth giving up friendship as a member of the bar over money, that was my philosophy." (N.T. 4/30/02, pp. 362-65.) (emphasis added)

## C. *Evidentiary Errors*

### 1. Expert Testimony Regarding Legal Ethics

We did not err in permitting *James Schwartzman, Esquire,* who was the chairman of the Pennsylvania Supreme Court's Disciplinary Board, to testify on plaintiff's behalf as an expert on legal ethics, regarding whether there was an ethical bar to the receipt by her of the referral fee. The court had ruled as a matter of law that there was no ethical bar, but the issues had been presented to the jury through testimony. Since these issues were beyond the ken of laymen, it was proper and in no way prejudicial to the defendants that the expert testimony was permitted.

### 2. Liability of the Parties

The defendants asserted that we erred in permitting the introduction of evidence relating to the individual liability of Epstein to contract for payment of a referral fee to plaintiff individually or as agent of SGR. They also contended that we erred in admitting evidence relating to the liability of SGR as a successor or assignee

of an agreement for the payment of a referral fee to plaintiff.

The defendants also contended that we erred in admitting evidence on the issue of conversion.

We concluded that both Epstein as an individual and SGR in its own right and vicariously could be liable to plaintiff for breach of contract and conversion. Therefore, the evidence was properly admitted.

### 3. Scope of Plaintiff's Guardianship

The defendants contended that we erred in restricting their right to introduce evidence concerning the scope of plaintiff's guardianship of Tara M. (Citing N.T. 4/29/02, pp. 26-27, 27-34, 117; N.T. 4/30/02, pp. 333, 340-43, 366, 371-73.)

The issue was the scope of plaintiff's appointment as guardian of Tara M. We held that the defendants could cross-examine plaintiff about that matter. However, the defendants could not ask the jury or other witnesses to make *inferences* about the scope of the two orders issued by Judge Lewis, beyond the clear language of the orders, because the petitions upon which the orders were granted were not presented.

Our ruling was proper.

### D. *Jury Instruction*

The defendants contended that we erred in charging the jury as follows:

(1) When we linked defendant Epstein with Jablon, Epstein, Wolf and Drucker P.C. and with SGR (citing N.T. 5/6/02, pp. 1424-26, 1428);

(2) When we instructed the jury that defendant SGR could be liable for a referral fee agreement made by defendant Epstein on any one of five different theories (successor liability, merger, implication, assignment and agency), thereby effectively instructing the jury improperly to find liability against SGR (citing N.T. 5/3/02, pp. 1183-95, 1201-1204, 1227-28; N.T. 5/6/02, pp. 1250-51, 1404-1405, 1414-19, 1428, 1437-38);

(3) When the court instructed the jury that the scope of plaintiff's guardianship of Tara M. was narrowly limited despite an order of the orphans' court to the contrary;

(4) When the court instructed the jury that Mr. Epstein and/or SGR could be liable for conversion;

(5) When the court failed to instruct the jury that plaintiff did not have the right as a guardian of Tara M. to enter into an agreement for the payment to her of a referral fee. (Citing N.T. 5/3/02, pp. 1233-37.)

All of the above instructions were consistent with the evidence presented and were proper.

Finally, defendants also asserted that we erred when we charged the jury that SGR could be liable as a result of the negligence of Mr. Epstein even though negligence was never an issue in the case. (Citing N.T. 5/6/02, pp. 1401-1402.)

We instructed the jury in accordance with Pennsylvania Standard Suggested Civil Jury Instructions, 4.02. That instruction did refer to negligence, which was not an issue in the case. *No one brought that to the attention of the court during the charging conference.* Mr. Dugan raised the point for the first time after the charge was

given. (N.T. 5/6/02, pp. 1401-1402.) We then gave the jury an amended charge on this issue:

"Members of the jury, each of the counsel had indicated to ask me to correct, give a curative instruction on some statements that I made that may have been incorrect, and on one of them I do note that I read the charge, and I read it exactly from the book and I shouldn't have used one word in there. One was negligence, because there's no negligence here.

"So here's what I want to tell you. When I read vicarious liability and I read charge 4.02 and 4.03, I mentioned the word 'negligence.' There is no negligence in this case. This case deals with whether there was a contract, whether there was a breach of the contract or whether there was conversion. Okay? So it's those three things. I improperly, when I was reading it, used the word 'negligence.' It just slipped through. So the counsel correctly stated for me to tell you that. Remember? So it's breach of contract, whether there was a contract, and conversion." (N.T. 5/6/02, pp. 1440-41.)

The court did err in mentioning negligence in our initial instruction. But we cured the error in our supplemental instruction, to which there was no further objection. (See N.T. 5/6/02, pp. 1448-53).

### E. *Additur*

Plaintiff moved for an additur, contending that the verdict was inadequate.

This court has the power to mold the verdict of the jury to conform to the finding of the jury on liability, so that the record accorded with the facts. *House of Pasta Inc. v. Mayo,* 303 Pa. Super. 298, 307, 449 A.2d 697,

701-702 (1982). We are permitted to increase the verdict by way of additur when we find that the award is inadequate as a matter of law. *Fiorenza v. Kohn,* 396 Pa. Super. 1, 4, 577 A.2d 1384, 1385-86 (1990).

In the case at bar, plaintiff presented evidence that she had entered into a referral fee agreement requiring defendant Epstein to pay to plaintiff one-third of any recovery of attorneys' fees, after expenses.

Defendant Epstein denied that there was any agreement at all.

The jury found in answer to interrogatories that there was a referral fee contract and that both defendants had breached it.

It is undisputed that the gross attorney fees received by SGR in connection with the Tara M. settlement was $1,313,705.50 and costs were $20,705. The net recovery to SGR was $1,293,000. One-third of that sum was $431,000.

The jury had no basis for awarding plaintiff half that amount. Therefore, we did not err in adding $215,500 to the verdict rendered by the jury, for a total verdict of $431,000.

### F. *Pre- and Post-Judgment Interest*

To the above sum, we properly added pre-judgment interest at the rate of 6 percent from March 3, 2001, totaling $30,429, for a total award of $461,429, because the amount of damages ($431,000) was readily ascertainable. We also properly concluded that plaintiff was entitled to post-judgment interest.

## G. *Notice of Claim for Punitive Damages*

The defendants alleged they were not put on notice of plaintiff's claim of punitive damages and even if they were, there was no case law supporting that claim. The records clearly contradict that claim:

"The Court: Why isn't a complaint alleging punitive damages and a letter saying that he is going to be pursuing it, why isn't that sufficient notice that the plaintiff is pursuing punitive damages?" (N.T. 4/30/02, p. 246.)

"The Court: Let me at least for the record indicate this:

"The court has reviewed the *Needleman* case, which is 705 A.2d 875, Pennsylvania Superior Court 1997, in which the court had found that it's applicable in this case, and it says specifically this to the *Needleman* case: The trial court could find an attorney and/or affirm [sic], I would assume, personally liable for violating the terms of a referral agreement, and we have a referral agreement controversy in this case, even though he claimed that he was acting on behalf of a professional corporation, and we have the same allegation in this case.

"An attorney who has admitted the existence of a referral agreement could not later deny the existence of the agreement, even though the claim was made that the agreement was fraudulently induced.

"Once a legal fee has been received, a portion of that fee representing referral fee can be the subject of a conversion by the attorneys."

"And the Superior Court goes on to say conversion by an attorney and part of an attorney's fees received representing the amount owed to another attorney as a refer-

ral fee, which we have this in this case in brackets, was sufficient to sustain an award of punitive damages.

"It would appear that the *Needleman* case is on point on this case, and the issue is whether or not you've been put on notice, if you agree that you were put on notice at the time that the complaint was filed and at the time that you received the letter from plaintiff's counsel. I can't see where you are saying that you were then not put on notice." (N.T. 4/30/02, p. 252.)

In addition to the above on April 23, 2002, plaintiff sent an additional letter to both defendants regarding the punitive damages and defendants did acknowledge receipt of same.

"The Court: Let me read this for the record. April 23, 2002. Letter to Daniel Dugan and Alan Epstein.

"This is to advise you in connection with the plaintiff's request for punitive damages. The plaintiff requires defendants to be prepared to provide full and complete financial information concerning their net worth including but not limited to balance sheet, bank balance statements, valuation, financial statements, et cetera, during the appropriate phase of the trial so that the defendants could be examined as such. Thank you for your time and attention. Bochetto and Lentz, George Bochetto." (N.T. 4/30/02, pp. 260-61.)

"Mr. Bochetto: This is a fax confirmation sheet that shows the date and time it was faxed, and it was sent regular mail and I believe Mr. Dugan will acknowledge he received it.

"Mr. Epstein: I received it, your honor. I received it at the end of the week.

"Mr. Dugan: I'm sure I saw it whenever it came in, your honor. 23rd, I think, was Wednesday of last week." (N.T. 4/30/02, p. 261.)

## H. *Remedy With Respect to Punitive Damages*

The jury found that the defendants were liable to plaintiff for both breach of contract and conversion. The finding as to conversion supported the possibility of punitive damages and the second phase of the trial was held. See *Bernhardt v. Needleman, supra.*

Plaintiff then presented additional evidence to support their contention that the defendants "engaged in outrageous, malicious, wanton, reckless, willful or oppressive behavior."

Apparently, Mr. Epstein, despite the following comments of the Pennsylvania Supreme Court regarding his actions a number of years before, continues to do whatever he pleases in the practice of law.

Defendant Epstein testified as of cross and admitted that in 1977 he and other associates left the firm of Adler, Barish, Daniels, Levin and Creskoff and started a new firm, Jablon, Epstein, Wolf & Drucker. Adler, Barish sued them for injunctive relief because the new firm was stealing their clients. The Supreme Court of Pennsylvania held that injunctive relief was appropriate and that the plaintiff could maintain an action for intentional interference with existing contractual relations. *Adler, Barish, Daniels, Levin and Creskoff v. Epstein,* 482 Pa. 416, 393 A.2d 1175 (1978).

The following quotes from the Supreme Court opinion were read to the jury:

"The firm[, meaning the Adler Barish firm] received documents relating to cases for which it apparently had no file. Contrary to the firm's procedure, Epstein personally maintained files for some cases. Likewise, Epstein did not adhere to Adler Barish policy concerning certain fees. Adler Barish obtained a case which was assigned to Epstein. He sent the file to an out-of-state attorney for further handling. *Instead of turning over the forwarding fee to the firm, Epstein kept it for himself.* It appears that these events led to termination of Epstein's employment." (N.T. 5/9/02, pp. 72-73.) (482 Pa. at 421 n.5, 393 A.2d at 1178 n.5.) (emphasis added)

*"The court concluded that appellees [quote] 'engaged in illegal solicitation in complete and total disregard for the Code of Professional Responsibility'* and thereby 'tortiously interfered with the contractual and business relations that exist between Adler Barish and its clients.' It found equitable relief appropriate in view of appellees' 'avowed intentions . . . to continue their illegal solicitation.' " (N.T. 5/9/02, p. 78.) (482 Pa. at 423, 393 A.2d at 1178.) (emphasis added)

"We[, meaning the Supreme Court] find nothing in the ' "rules of the game" which society has adopted' which sanctions appellees' conduct. Indeed, the rules which apply to those who enjoy the privilege of practicing law in this Commonwealth expressly disapprove appellees' method of obtaining clients. *Supra* part IIA, discussing Code of Professional Responsibility, DR 2-103(A). We find such a departure from '[r]ecognized ethical codes' 'significant in evaluating the nature of [appellees'] conduct.' " (N.T. 5/9/02, pp. 83-84.) (482 Pa. at 434, 393 A.2d at 1184.) (footnote omitted)

The jury could conclude from that evidence that defendant Epstein was not a trustworthy person.

Nevertheless, in answer to jury interrogatories relating to punitive damages, the jury found that neither defendant Epstein nor defendant SGR "engaged in outrageous, malicious, wanton, reckless, willful or oppressive behavior."

Plaintiff requested that we award a new trial on the issue of punitive damages. The request was based on two factors: *(1) the failure of the defendants to reveal financial information; and (2) misleading comments made by defendants during the punitive damages phases of the trial.*

Ordinarily, the finding of the jury that there is no *liability* for punitive damages would preclude us from granting a new trial as to punitive damages, merely because not all pertinent financial information regarding assets was disclosed by the defendants and presented to the jury.

However, we concluded that numerous statements made by the defendants and their counsel had a very great likelihood of affecting the jury's determination that there was no liability for punitive damages.

The following exchange took place during the punitive damages phase of the trial. Mr. Dugan, counsel for SGR, questioned his witness, Steven Gadon, Esquire, senior partner of SGR, on direct examination:

"Q. Okay. And is there any doubt in your mind that Spector, Gadon & Rosen *could honor the judgment* that this jury rendered for $215,500 if that becomes a final judgment?

"A. I don't know how many times I have to say it, but *we will honor our obligations.* We have and we will continue to. It's a matter of pride. My name is on the letterhead, all right? So you want to make sure that the bills get paid and things are taken care of. You have to have some pride in your name and what you do, and we've tried to do that." (N.T. 5/9/02, p. 219.) (emphasis added)

In closing to the jury during the punitive damages phase of the case, defendant Alan B. Epstein, Esquire, stated:

*"And as a result of your verdict,* determining whether or not under the law and the facts as given to you by his honor, the law and the facts that I don't necessarily agree with even to this day, but certainly you did and certainly the judge did, and certainly *I am bound by that* because that was your decision, you awarded her a substantially less amount of money." (N.T. 5/9/02, p. 253.) (emphasis added)

"We placed our faith in you, the jury. That's what the jury system is all about. You got a dispute. One person has a dispute with the other person. *You go to somebody in between and that person makes the final judgment. And that's what you did, and we are standing by that.*

*"You heard my commitment and Mr. Gadon's commitment to honor that commitment that you made for us.* You had to determine those issues. The judge told you you had to do that. . . .

"And you made the decision and that's what the courts are all about. And it's not wrong to do it that way. You decide it.

"And we told you from that witness stand and we told you in this writing here and we committed ourselves over

and over and over again that *she will be compensated* when there is a final judgment in this case and at the appropriate time.

"This firm always stands by its commitments. I never had that money. *I went to my firm and said are you going to stand by this? And they said yes and I confirmed it. Whatever the end result was, whatever happened here, we would stand by it.*

"Do I stand here and tell you that I agree with you and agree with each one of you as to your view on this thing? No. No. It is a legitimate, honest belief that I didn't owe the money back then and I don't owe it now. Do I come before you and say that I won't stand by the commitment that I made because that's the rule of law? Of course I will. I practice law in this community every day." (N.T. 5/9/02, pp. 259-61.) (emphasis added)

Mr. Dugan, representing SGR stated in closing argument:

"There's no doubt in the world, based on the testimony you've heard here, that *my firm can and would pay any judgment* that they have to pay." (N.T. 5/9/02, pp. 264-65.) (emphasis added)

In this case, plaintiff requested in her post-verdict motions that defendants be precluded from challenging the jury verdict by post-verdict motions or appeal as a result of the above statements.

The defendants responded that the above statements only reflected their intention to pay plaintiff the amount of the verdict after it became a "final judgment," meaning, after the court enters judgment against them and the judgment is not overturned after all appeals are exhausted. (N.T. 11/25/02, pp. 44-45.)

We denied plaintiff's motion because we concluded that it was not the *intent* of the defendants to waive post-trial motions and their appeal rights.

However, we also found that it *was* the *intent* of the defendants to *trick* and *mislead* the jury into believing that their award of $215,500 was a *final judgment* which would be paid *immediately* to plaintiff. It was misleading evidence and argument that the defendants had "good intentions" from the start, and it was *totally improper.*

The court is confident and believes that the *intentionally misleading statements* made by the defendants that they would pay the decision of the *jury caused the jury* to find that there was no basis for concluding that they "engaged in outrageous, malicious, wanton, reckless, willful or oppressive behavior." The defendants' *deceitful* conduct *required* that we grant plaintiff relief.

We also believe that the defendants used delaying tactics throughout the trial, by making repeated, unnecessary objections and by their refusal to turn over financial information. Their tactics required numerous conferences outside of the presence of the jury and turned what should have been a several day trial (which they previously informed the jury at voir dire) into six days of testimony on the compensatory damages phase of the trial alone. Jury selection was on April 26, 2002. The punitive damages verdict was not until May 13, 2002.

We believe that this wore out the jurors to such an extent that they could no longer give the plaintiff their fair attention when the punitive damages phase of the trial began nine trial days after jury selection.[5]

_____

5. After the punitive damage verdict was rendered, the jury expressed to this court, in private conversation in the courtroom with no

Ordinarily, relief for the defendants' misconduct would be a new trial on the issue of punitive damages.

We concluded that post-verdict discovery was necessary in this case because *the defendants willfully and repeatedly refused to disclose their assets as ordered by this court prior to and during the punitive damages phase of the trial.*

On May 9, 2002, *prior* to start of the punitive damages trial, the court stated:

"The Court: Counsel, counsel, I requested you last Friday, for both you and the defendant Spector Gadon, to present any and all net worth documents including tax returns, financial statements, et cetera. And I indicated that they would be applicable in the event that there is a punitive damages aspect.

"For you to present just a profit sharing plan itself for $21,000 is well beyond any commonsense reading of what the court requires on a [sic] punitive damages and net worth and tax returns.

"I find that you have violated the court order. I think it's clear. Why you would have done this is beyond me." (N.T. 5/9/02, pp. 5-6.)

Mr. Epstein and SGR's position was expressed as follows

"Mr. Epstein: Yes, your honor. *I was asked to bring in financial documents that reflect my net worth,* period. I

---

one else present, their exasperation: that they were led to believe by counsel that the case would end by Friday, May 3, 2002. Instead, on May 10, 2002, they were still deliberating the punitive damage claim and they decided that by May 13, 2002, they had to end their deliberations and return to their respective jobs.

was not given an enumerated statement, as is required. But the fact is—" (N.T. 5/9/02, p. 4.) (emphasis added)

Yet Mr. Epstein stated he did not know what documents to take into court. He requires an enumerated statement or list from the court. Mr. Gadon (senior partner of SGR), is a *CPA* and he claims he did not know either, what to take to court for net worth purposes.

Counsel Dugan claimed they did not yet prepare 2001 tax returns; therefore, the court will get nothing from them.

According to their position, the litigants in any case will decide what is relevant or not relevant and not the court or the judge.

Mr. Dugan stated to this court:

"Mr. Dugan: . . . The tax returns for 2001 have not yet been prepared, so they don't exist. And the financial statements have not been generated either.

"The Court: Well, hold on a minute. Let's not be disingenuous. You may be correct that the tax returns for 2001 do not exist but 2000 does, 1999 does, 1998 does. Correct?

"Mr. Dugan: Yeah, but what's the relevance of prior tax years when they're making the decision as to the net worth of Spector Gadon today?

"The Court: Okay. Well, your statements are noted for the record. I find at least initially that this is a *violation* of the court order in which we had requested such on [sic] prior to the trial, but we'll have to deal with that at another date." (N.T. 5/9/02, p. 19.)

Plaintiff's attorney correctly requested what documents were required from the defendants and stated:

"Mr. Bochetto: Here's what he's handing me, judge, a two-page document, computer generated, listing assets, supposedly listing assets and liabilities. No financial statements, no accountant reports, no statement of income, profits, losses, no tax returns. This is a 50-man law firm." (See N.T. 5/9/02, p. 17.)

Subsequently, the court stated:

"The Court: Yes, I want to read it too. For the record, this indicates that this is to advise you. *This is a letter to Dugan and Epstein, from Bochetto & Lentz.* 'This is to advise you in connection with the plaintiff's request for punitive damages. Plaintiff requires defendants to be prepared to provide full and complete financial information concerning their net worth, including but not limited to balance sheets, balance statements, valuations, financial statements during appropriate phase of the trial so that the defendants can be examined as to such. Thank you for your time and attention. Signed by Bochetto.' " (N.T. 5/9/02, p. 28-29.) (emphasis added)

The defendants claim they had no idea what documents to present to the court to show net worth. (See N.T. of Mr. Epstein p. 5, line 6 to line 9.)

"Mr. Epstein: You did not, your honor, specifically tell me to bring any specific documents. You had asked me to adhere to the letter that was given to me by Mr. Bochetto." (N.T. 5/9/02, p. 5.)

Regarding SGR: With Mr. Gadon, senior partner, on stand:

"Mr. Bochetto: Excuse me, Mr. Gadon. On April 23, 2002, I forwarded a letter. This was in writing to Mr. Dugan, who was Spector Gadon & Rosen's lawyer, which outlined requires to be prepared to provide full and com-

plete financial information, including but not limited to balance sheets, bank statements, valuations, financial statements, et cetera. . . ." (N.T. 5/9/02, p. 23.)

During the punitive damages phase of the trial, the only document that defendant Epstein disclosed was a profit sharing plan in the amount of $21,000, which he asserted was the only thing that he owned in his own name. (N.T. 5/9/02, pp. 4-7, 134.) Given the fact that defendant Epstein had been practicing law for 30 years, he was a partner and department chairman in a major law firm which grossed approximately 14 million dollars a year and he owned 10,000 shares of the firm's stock, we found that assertion to be disingenuous. (See N.T. 5/9/02, pp. 97, 133, 141-42, 197-98, 212.)

*Thereafter, the defendants willfully refused all of our orders directing them to participate in post-verdict discovery.* The recalcitrant positions taken by the defendants required that we formulate a unique solution. Thus, we sua sponte offered plaintiff an alternative. Plaintiff could receive a new trial on punitive damages (and expend additional resources on both the trial and continuation of the battle to get defendants to disclose their assets) or she could elect to receive the sum of $645,000 in punitive damages. That sum was formulated by the court and was approximately triple the amount originally awarded by the jury in actual damages, and one and a half times the amount ultimately reached by the court after the additur. Plaintiff elected to receive $645,000 in lieu of a new trial on punitive damages.

The election formulated by the court and accepted by the plaintiff was appropriate under the unique circumstances of this case.

## I. *Contempt of Court*

The court issued a contempt citation against the defendants because of their failure to disclose financial information and subsequently because of their failure to comply with the orders of the court, post-trial.

Defendants asserted that we gave them no opportunity to present evidence on this issue. To the contrary, on September 17, 2002, we served upon the defendants a rule to show cause why they should not be held in civil contempt for failure to prepare and produce financial records at the punitive damages stage of the trial. The rule was returnable November 25, 2002. Defendants appeared on November 25, 2002, but presented no evidence in their behalf.

At that time, the court established a time-table for further discovery, none of which the defendants followed. They subsequently *ignored* all orders of the court.

On March 10, 2003, we ordered the defendants to pay $7,500 to the court of common pleas for their misconduct during the punitive damages portion of the trial. This represented costs of $2,500 per day for the three wasted days of trial.[6]

We ordered the defendants to pay plaintiff $124,219-.86 in attorney's fees pursuant to 42 Pa.C.S. §2503, which represented the documented expenditure by plaintiff's counsel relating to their efforts to make the defendants comply with the court's orders relating to punitive damages *only.*

---

6. The sum of $2,500 was determined several years ago as being the costs of staffing and running a courtroom. That amount is no doubt higher now.

We awarded plaintiff the sum of $26,500 in accrued fines to be paid by defendant Epstein and $53,000 in accrued fines to be paid by defendant SGR, because of their disregard of our order of January 15, 2003.

The defendants have caused both the court and counsel for plaintiff to expend documented hours of unnecessary labor because of their intentional and willful disregard of the orders of the court. They acted with contempt of the judicial system when they prematurely entered judgment and filed appeals. To contend that we have not given them *their* day in court to defend themselves is nothing less than disingenuous.

## V. CONCLUSION

The legal system can only function if counsel are both competent and trustworthy.

In the case at bar, plaintiff Nancy Kanter, a member of the Pennsylvania Bar, trusted Alan B. Epstein, another member of the Pennsylvania Bar, to both handle the Tara M. case in a competent manner and adhere to the oral contingency fee agreement that they entered into.

In retrospect, plaintiff Kanter should have requested that the contingency fee contract be in writing. She was naive: she trusted defendant Epstein, as a fellow member of the bar. That trust was sorely misplaced.

Defendant Epstein breached the trust plaintiff had placed in him to deal fairly with her.

Defendant Spector Gadon & Rosen P.C. is equally liable for that breach of trust as both the employer of defendant Epstein and because they failed to make any kind of independent investigation to verify the veracity of plaintiff's claims.

The defendants also breached their duty of fair dealing with plaintiff when they refused to turn over their financial records during the trial.

*The defendants breached their duty of fair dealing with this court* when they: willfully disregarded our verbal orders to provide plaintiff with documents relating to their financial assets; when they entered snap judgments after agreeing in open court to an extension of Rule 227.4; when they willfully disregarded the written orders of this court regarding post-trial discovery; when they filed multiple, premature appeals; and when they filed 1925(b) statements that raised substantially more issues than they will be permitted to address on appeal because of the limitations set forth in Pa.R.A.P. 2135.[7]

If the type of activity engaged in by the defendants were to be permitted, our court system would break down. Those attorneys who delay and obfuscate would be rewarded; while those who play by the rules would suffer. Our legal structure, which is based on honesty and fair play, would come to an end.

The orders of this court were intended to give full and complete redress to the plaintiff as well as to uphold the dignity and authority of the court system. They should be affirmed.

---

7. Rule 1235 provides that the body of appellate briefs shall not exceed 50 pages of conventional typographical printing or 70 pages of reproduction by any other process of duplicating or copying.